# HAROLD SCOTT *v.* STATE OF MARYLAND

[No. 189, September Term, 1967.]

430

*Decided March 22, 1968.*

The cause was argued before MURPHY, C. J., and ANDER-SON, MORTON, ORTH, and THOMPSON, JJ.

*Michael Lee Kaplan,* with whom was *Morris Lee Kaplan* on the brief, for appellant.

*Frank A. DeCosta, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Fred Grant, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The appellant was convicted in the Criminal Court of Baltimore before Judge Thomas J. Kenney, presiding without a jury, of breaking the dwelling house of James Edward Jones at 901 Duncatel Street with intent to steal and of grand larceny of Jones' properties. He was sentenced to imprisonment for a term of 10 years for each offense, the sentences to run concurrently.

On appeal from the judgments, he first contends that a culpatory statement admitted in evidence was not made by him to the police freely and voluntarily because he had been denied a request to call a lawyer and because he had been induced to confess by a promise of the police to release a female companion taken into custody with him.

Evidence adduced by the State was that the appellant was observed about 1:15 P.M. on October 12, 1966 by police officers Nicholas Caprinello and Francis Baker while he was walking in the 900 block Whitelock Street carrying a record player answering the description of one stolen in a burglary. A girl, Regina Carter was with him. When the officers first rode by the appellant he placed the record player on the ground next to a parked automobile and continued walking. They accosted him and he told them the record player belonged to Regina. She denied it, stating that it belonged to the appellant. He said he was taking it to be fixed but "simultaneously she said they were taking it to her mother's." There was a record on the player but the appellant could not tell them the name of the song recorded. Regina said, "Well, we haven't done anything wrong. You can go over and look in our apartment, if you want to." About that time Sergeant Donald Bedsworth drove up and gave the officers "certain information, which caused us to place Mr. Scott under arrest at that time * * * He was arrested for investigation of homicide." Immediately upon placing him under arrest, Caprinello, according to his testimony, warned the appellant in accordance with the procedural safeguards required by *Miranda v. Arizona,* 384 U. S. 436.[1] The appellant made no statements at that time. Baker and Regina went to the apartment at 912 Whitelock Street, second floor. Baker saw "several articles sitting around—lamps, television, clocks—which to me seemed familiar with the articles that had been taken in a previous burglary." As a result of "information received" from Regina "certain items" were removed from the apartment and taken to the Northern District Police Station. The appellant was taken to the Northern District Police Station and "again advised of his rights" by Bedsworth in the presence of Caprinello and Baker.[2] The appellant

---

1. However, from Caprinello's testimony it appears that the appellant was not informed at that time that if he could not afford an attorney one would be appointed for him prior to any questioning, if he so desired.

2. At this point in the trial both Caprinello and Baker testified, and later in the trial Bedsworth testified in rebuttal as to what Bedsworth said to the appellant. By their composite testimony it

was confronted with the articles recovered from the apartment and after talking to Regina, stated that he and another "fellow" had broken in the house at 901 Duncatel Street and took the articles. They carried them to Regina's apartment. On cross examination Baker said that no threats were made to the appellant, no one told him that "if in the event that he didn't make a statement, he might get a lengthy sentence," no promises were made to him, and no officer told him that if he made a statement Regina would be released. Baker did not recall whether the appellant requested "her release if he made a statement." The testimony above summarized was apparently accepted both as to the voluntariness of the statements and on the issue of guilt or innocence of the appellant, but we think it clear that the testimony of what the appellant said was admitted subject to exception pending the determination of the court on the question of voluntariness. Defense then produced the appellant "solely for the purposes of testifying as to the question of whether your statement was freely and voluntarily given." He said he was 25 years of age and had a 10th grade education. He denied that he had placed the record player on the ground and said he was still carrying it when the officers came up. He told the officers it was Regina's record player and that he had just come out of the apartment across the street. "I said it was the apartment of Regina's, and I told him that. He took Regina—he say well, I would like to check on this, and he took Regina across the street and seen the landlord. The landlord evidently verified that she—." At this point his counsel interjected another question. He denied that he was given the *Miranda* warnings while on the street. The officers "got the merchandise out of the apartment * * * but then her apartment wasn't mine, so I didn't object." He was then taken to the station house "directly to the Sergeant's Room." Caprinello, Baker, a sergeant and another officer were present. He was questioned in an attempt "to find out information about this — about different items they took out of the apartment,"—lamps, the record player

appears that Bedsworth informed the appellant with respect to all of his rights as required by *Miranda*. The appellant did not contend at his trial and does not contend on appeal that all the *Miranda* warnings were not given him.

and a television were in the room. Another officer, whose name he did not know, came into the room and looked at the articles taken from the apartment "* * * and he called the Sergeant out of the room, and the Sergeant—when the Sergeant came back, he say, this look like some merchandise that we had word of two days ago. He say, I got you now, and went out to pull the records for this burglary." When the Sergeant came back with the records he told the appellant, "I will advise you of your constitutional rights ; say anything that you say could be held against you * * *." He stated that he was not threatened but that he told them "I would like to have a counsel, I'm not going to make any more statements until I have a lawyer." This was about 4 :00 P.M. and then he was placed in a cell. The next morning about 9 :00 A.M. the Sergeant, in the presence of another officer whom he thought to be Baker, but he was not sure, said that "if I go on and made a statement and make it light on everybody else around them, they would make it light on myself; and, then, make a statement, and I can get Regina off * * * And they say, if I make a statement and verify that she didn't know anything about it, that they would cut her loose. And when I say cut her loose, to release her * * * They told me to put it down on tape, on a tape recorder. So all the officers came back into the room, I made the statement on the tape recorder, and right after we left out of the room, the Sergeant gave Officer Caprinello orders to go down and release her." The appellant did not depart from his direct testimony in any substantial detail on cross examination. He was positive in his denial that he made a statement on the day of his arrest and that he confessed that he took "the merchandise along with another man" only on the following day at which time his statements were taped. He "made no statements on the street with regard to the burglary." He maintained that he confessed only because he "wanted Regina out."

At this point the court found as a fact that the initial contact of the officers with the appellant was an accosting and that the appellant had placed the record player on the ground and walked away from it when he saw the officers. It found as a fact that the officers notified the appellant of his constitutional rights on the street; that he made no admission on the street;

that he was advised of his rights in the station house again; that after he was advised of his rights, he was shown the merchandise and that he did not ask for a lawyer. It accepted the version of the police officers as to what the appellant said to them. The court admitted the testimony as a voluntary statement. But it appears from the record that the court permitted the issue of voluntariness to be reopened. Defense counsel informed the court that the appellant now alleged that the officers admitted to the judge presiding at the preliminary hearing that he had requested an attorney and that the judge had excluded the admission at the hearing for that reason. The court gave defense counsel an opportunity to explore the matter and court adjourned until 2:00 P.M. When court reconvened defense counsel stated that he had been unable to reach the hearing judge. The court granted counsel's request to allow him to make further effort "to check out (the hearing judge's) possible testimony" but proceeded with the balance of the State's case consisting of testimony of James E. Jones and his wife concerning the breaking of their premises and the properties stolen. After the State rested, defense counsel said he would prefer to withdraw his motion for judgment of acquittal and to strike the testimony as to the admission until the hearing judge had been contacted. He requested a continuance which the court granted, saying, "* * * [I]t is possible and conceivable that if he (the hearing judge) had any testimony, that then to reflect on the credibility of the officers with respect to advice given about constitutional rights and the timing of when the admissions were made, and it might very well have a bearing on the admissibility of this, which I am asked to pass on now." After a recess the court was informed that both the State and defense counsel had talked to the hearing judge who said he "really has no independent recollection of the case at all." He suggested that the clerk at the "Northern Court" be called "to check the Docket Sheet to see whether he made any notation on this case." The clerk was unable to do so until after 4:00 P.M. The court felt that the State and defense counsel had talked to the hearing judge about different matters, the State about a record player and the defense counsel about a recorder on which the confession was taped. It stated it would

like to know if the hearing judge knew "whether the police ever admitted (the appellant) asked for a lawyer and when it was." The State offered to bring the officers back and the court stated, "I think you ought to have them back here for any possible rebuttal." The case was continued until the next day. When trial was resumed defense counsel reported that he had talked to the hearing judge and that the judge had "no recollection of this particular case." Defense counsel renewed his motions for judgment of acquittal and to strike the testimony as to the admission. The court said, "I deny both motions without prejudice." We conclude from the language of the denial that the court was reserving a final ruling until it considered other evidence on the matter which might be produced. The defense offered the appellant, not solely as to the voluntariness of the admission, but on the merits. His testimony as to the events prior to being taken to the police station was substantially the same as his previous testimony. When he was taken to "the Sergeant's Room at Northern Police Station" they questioned him and Regina about the merchandise taken from Regina's apartment. "This session went on for about an hour." It was then that another officer came into the room, looked at the merchandise and called the Sergeant out of the room. The Sergeant came back and told the appellant, "We got you now" and mentioned Duncatel Street and "the Joneses." Then he notified him of his "rights". After he had been given the *Miranda* warnings he asked to have a lawyer. He was not furnished a lawyer "but the questioning stopped, then. They didn't ask me no more questions." The next morning about 9:00 A.M. he was returned to the "Sergeant's Room" and Sergeant Bedsworth said, "Well Scott we got you * * * the only thing that will save you a little time, a little formality—save us some time and formality, say, go on and confess to the crime and I promise you we will turn Regina loose. I thought about it for a while. Well, I was thinking about it really all that night * * * I'm trying to get in touch with a lawyer, but I don't have any money right now. And, then, the Sergeant, like I said, the Sergeant gave me this proposition, saying that if I go and make a confession to the crime, put it on a tape recorder—because he had a small tape recorder in the room—and put it on tape, that he would

turn Regina loose. So, when Regina came back and the rest of the officers came back into the room, he say, do you want to make any statements, and I said, yes, sir, I do. And he took out the tape recorder, and fixed it up, and Regina started to object, but I stopped her. I say, well, you just go on and keep quiet, and I will take care of this. And I went on and made a confession." After he made the statement Regina was "immediately released." In his testimony at the trial he denied breaking into the premises and taking the properties.

Officer Baker was recalled by the State in rebuttal. He said that, when the appellant was taken to the police station, Bedsworth "first advised him, before speaking to him, of his constitutional rights * * * The defendant was advised that he didn't have to say anything at this time; that he could have a lawyer present if he wished; and he was advised that anything that he said could be held for or against him. If he didn't have counsel, the State would appoint him one." At that time he was confronted with the property taken from Regina's apartment. After he talked to Regina "who came in, he stated that he and another fellow, whose name I cannot remember, had broke in the house at 901 Duncatel Street * * * he stated that those were the articles taken in the burglary. And he took them to Regina's house. The friend took some of them, and he took some of the others." Baker testified that no one told the appellant that things would go easier with him if he made a statement; no one made him any promises; no one told him that Regina Carter would be turned loose if he made a statement; and that the appellant did not request a lawyer. Baker was in the appellant's presence during the entire interrogation.

Officer Caprinello was recalled by the State in rebuttal. He testified that upon telling the appellant that he was under arrest, on the street he "advised" him of his constitutional rights and by his testimony at this time he gave him all the required warnings. The appellant made no statements at that time nor did he ask for an attorney. His testimony as to the events at the station house were the same in all material aspects as that of Baker. It was brought out on cross examination that Regina Carter was released the next day.

Sergeant Bedsworth was called by the State in rebuttal. His

recollection as to the *Miranda* warnings given on the street omitted the second one but otherwise was substantially the same as the testimony of the other officers as to the events prior to the interrogation of the appellant at the station house. His testimony as to the warnings he gave the appellant at the station house omitted the warning that anything the appellant said could be used against him in a court of law and the right to the "presence of an attorney", although he told him of his right to have an attorney.[3] His testimony as to the substance of the appellant's admission was the same as that of the other officers. He denied telling the appellant that "things would be a lot easier for him if he confessed to this crime; that he had better confess or Regina would be held; or that Regina would be released if he made a confession. On cross examination he stated that the appellant gave the "exact same statement" the following day which was recorded on tape.[4] He said that at the preliminary hearing the appellant told the judge that he had given a statement "free and voluntary" and that he had not requested the presence of an attorney.

Defense counsel again moved for a judgment of acquittal and to "strike out the alleged admission of the defendant, that it was not freely and voluntarily given." The motions were denied. We think from the record that it was by this ruling that the trial court actually determined that the confession was freely and voluntarily made. The credibility of the witnesses and the weight to be given their testimony are matters for the trier of facts. *David v. State,* 1 Md. App. 666. We do not think that the trial court was clearly erroneous in finding that the constitutional warnings to which the appellant was entitled under *Miranda* were afforded him, that they were given prior to his custodial interrogation, that the appellant had not requested a lawyer before he confessed, that he had not been denied an opportunity to call a lawyer, that the police had not promised him that Regina would be released if he confessed, and that the con-

---

**3.** By the testimony of the other officers all the warnings were given. The omission in Bedsworth's testimony goes to its weight, a matter for the trial court.

**4.** The taped confession was not offered in evidence.

438

fession was otherwise voluntary.[5] We hold that the confession
was properly admitted.

_____

5. The appellant, as we have noted, did not allege that all the
*Miranda* warnings were not given him in the station house. His
attack on the admission of the statement, both below and on appeal,.
is solely on the grounds that he was denied an attorney and induced
to confess by the promise to release Regina. He did not at his
trial, and does not on appeal, contend that he did not fully under-
stand that he had a right to remain silent, that anything he said
could be used against him in a court of law, that he had the right
to the presence of an attorney, and that if he could not afford an
attorney one would be appointed for him prior to any questioning
if he so desired. Although the record does not show that he ex-
pressly waived those rights, *Miranda* does not compel an express.
waiver and recognized that there may be a fully effective equiva-
lent to the warnings required and the waiver necessary. 384 U. S.
476. In *Johnny Mack Brown v. State*, 3 Md. App. 313, we discussed
at length the question of waiver and concluded that " * * * the
ultimate determination of whether the (individual) knowingly and
intelligently waived his *Miranda* rights before making a statement
is governed, in the final analysis, by whether the particular facts.
and circumstances surrounding the case are such as to demonstrate
an intelligent and intentional relinquishment or abandonment of a.
known right or privilege." See also *United States v. Hayes*, 385 F.
2d 375 (4th Cir.). In any event we think that the existence of a
waiver was implicit on the facts and circumstances of this case.
The appellant does not allege a physical coercion and the record
shows none. We have found that the evidence believed by the trial
court was sufficient for it to find that there was no psychological
coercion by way of promises or inducements or otherwise. As was.
stated in *Hayes, supra*, p. 378, "Moreover, it is noteworthy that at
no stage in the proceedings has the appellant ever denied that he
understood the warnings given him, and while a defendant does
not have the obligation to testify himself or to offer testimony, a.
court cannot supply evidence that is lacking." In the instant case the
appellant testified at length on two occasions during his trial and
his testimony did not indicate that he was other than knowledge-
able and intelligent, at least commensurate with his age and ex-
perience and above his 10th grade education. During his testimony
with respect to his version of the circumstances leading to his con-
fession, the substance of which he admitted he made as testified by
the officers, he said that, at the time of his arrest on the street,.
"I didn't ask for a lawyer because they keep telling me that this.
would only be a few minutes." He agreed that at the station house
he was told that he "didn't have to say anything," he "had a right

The appellant next contends that his arrest was illegal and that the articles taken from Regina's apartment were improperly admitted in evidence.[6] The short answer is that the legality

---

to a lawyer" and that if he could not afford one, a lawyer would be appointed for him. He thereupon requested a lawyer. He admitted that he knew he was confessing to a crime and did so for two reasons—one, to "save Regina" and two, "because I knew the statement on the tape recorder couldn't be admitted in court." He alleged that he did not make the statement the day of his arrest because "I didn't have a lawyer present, and I didn't really commit the burglary." But when he did confess the day after, he had "thought about it for a while. Well I was thinking about it really all that night," and confessed "because I know what he was trying to do wasn't legal" (tape the confession). Asked if he had ever heard how he might get in touch with a lawyer, he said, "Well, I could have phoned a lawyer, but at the time I didn't have any money" (to make the phone call). He did not allege he asked to make such a call. In answer to an inquiry as to whether he was "familiar with the procedures in a police station" concerning questioning by the police he said, "I had heard several things, but I don't know the law, as a lawyer would, or the way I would be able to fight in court. I do know certain things. I have an idea of how my constitutional rights should be—should be protected and how the police should interrogate. I am aware of some things. I don't know—not compared to a lawyer." He admitted he was "aware of the consequences of what would happen to you if the statement you made were admitted in court" and agreed that "in spite of that * * * made the statement so that Regina would be let loose from the station house." There was no "mere silence of the accused followed by grudging responses to leading questions" which could be afforded little probative value, *Hayes, supra*, p. 378, but a plain statement that he had broken into the premises and stolen the articles. Although the trial court found that the appellant had not requested a lawyer prior to his confession and that he had not been promised that Regina would go free if he confessed, we think from all the facts and circumstances in the record before us, that the trial court could properly find, as was implicit in its ruling that the confession was admissible, not only that the procedural safeguards of *Miranda* were followed but that the appellant fully understood them and voluntarily waived them, in the hope, not induced by the police, that Regina would go free, and with the expectation, well founded or not, that his confession would be inadmissible in court for technical reasons.

6. Actually it was a photograph of the articles, including the

440

of the arrest is here not material since the articles were not seized as a result of a search of the appellant's person or of premises with regard to which he had standing to object. See *Nadolski v. State*, 1 Md. App. 304. The trial court accepted the testimony of the police officers that when the appellant saw them "he put the record player down and walked away from it." The appellant thus abandoned it and cannot object to its seizure. *Davis v. State*, 2 Md. App. 630. It is clear from the record that the apartment was that of Regina Carter and further that she consented to the search of it. The appellant testified that "* * * her apartment wasn't mine, so I didn't object" (to the search of it). See *Fisher v. State*, 1 Md. App. 505; compare *Dorsey and Gladden v. State*, 2 Md. App. 40. There was no error with respect to the admission of the evidence concerning the articles.

The last two contentions of the appellant go to the sufficiency of the evidence to sustain the convictions. Julia Jones testified that when she left her premises, 901 Duncatel Street, on October 10, 1966 the front door of her apartment was locked and closed. Her husband, James E. Jones, testified that when he arrived home shortly after noon of that day (he had left the apartment before his wife), "the door had been busted open and everything." It was the front door and "somebody busted in, threw their body up against it, or took a hammer or something and bust it open." They identified the articles recovered by the police as belonging to them and as stolen from the apartment. The value of the articles was shown to be in excess of $100. They did not know the appellant and did not give him permission to have the articles in his possession. The *corpus delicti* was proved and the criminal agency of the appellant was proved both by his confession and his possession of the record player, recently stolen. *Allen v. State*, 2 Md. App. 740; *Scott v. State*, 2 Md. App. 705. The judgment of the trial court on the evidence was not clearly erroneous and we may not set it aside. Md. Rules, 1086.

*Judgments affirmed.*

---

record player recovered when the appellant was accosted, that was admitted in evidence. Objection to it was only on the ground of the alleged illegal arrest.