CHARLES CALVIN SOLES *v.* STATE OF
MARYLAND

[No. 229, September Term, 1972.]

*Decided January 26, 1973.*

The cause was argued before MOYLAN, GILBERT, SCAN-LAN and DAVIDSON, JJ.

*John J. Garrity* for appellant.

*Gary Melick, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County* and *Robert W. King, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Charles Calvin Soles, was the New York connection for a large-scale distribution operation for illicit drugs in Washington, D. C. After five days of activity in the District of Columbia, he left in the early morning hours of September 19, 1971, for a "midnight run" back to New York. Officer Terry Womack, of the

Vice Squad of the Metropolitan Police Department, was on automobile surveillance, waiting for the appellant to make his move from 30 Sheridan Street[1] in northeast Washington. He gave immediate pursuit and intercepted the appellant's 1971 Pontiac Grandville moments after it had crossed the Maryland line into Prince George's County. A search of the trunk revealed a large quantity of "cutting" and packaging paraphernalia, $6700 in hidden cash, and enough high-quality cocaine to produce an estimated 3240 "dime bags" worth an estimated "street price" of $32,400.

The appellant elected a court trial before Judge Ralph W. Powers in the Circuit Court for Prince George's County. He was convicted 1) of possession of cocaine in sufficient quantity to indicate an intent to distribute and 2) of attempted bribery. He was sentenced to respective terms of twenty years and five years, to be served consecutively. He attacks 1) the search, 2) the arrest, 3) the denial of an in-court lineup, and 4) the sufficiency of the evidence.

### The Automobile Search

The appellant was alone in his automobile when he was stopped. He was arrested and ordered to alight from his vehicle. He was directed to produce the keys to the trunk, with which the police opened the locked trunk. Underneath some clothing, they discovered a dark-colored briefcase. It was locked. After the appellant failed to produce a key for the briefcase, the police snapped it open. Much of the incriminating evidence was found inside the briefcase. The rest had been found inside the locked trunk. In any event, the search could not qualify as a "search incident" to a lawful arrest, which must be limited in geographic scope to the person of the arrestee and the immediately surrounding area "which may fairly be deemed to be an extension of his person."

---

1. Also referred to randomly in the transcript as 30 Sheridan Place.

*Chimel v. California,* 395 U. S. 752; *Brown v. State,* 15 Md. App. 584, 597-598. If the warrantless search of the automobile is to pass constitutional muster, it must qualify rather under the so-called "automobile exception," *Carroll v. United States,* 267 U. S. 132, to the basic proposition that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment." *Katz v. United States,* 389 U. S. 347, 357. The necessary conditions for such qualification are 1) probable cause to believe that the automobile contains evidence of crime and 2) exigent circumstances making the warrant procedure impractical and making the resort to the warrantless search reasonable and necessary. *Chambers v. Maroney,* 399 U. S. 42; *Coolidge v. New Hampshire,* 403 U. S. 443; *Peterson, Deal and Hunt v. State,* 15 Md. App. 478, 491-492.

## Probable Cause

We take up first the quantitative analysis of probable cause, which involves, in turn, the qualitative analysis of hearsay information coming to Officer Womack from a police informant.

Officer Womack was at home in Alexandria, Virginia, at approximately 12:30 a.m. on September 19, 1971, when he received a telephone call from one of his regular informants. That phone call triggered the police action of the next few hours and supplied the great bulk of the probable cause on which that action was predicated. In making our constitutionally-mandated independent review of the Fourth Amendment questions before us, it becomes our duty to evaluate that informant and his information by the "two-pronged" test of *Aguilar v. Texas,* 378 U. S. 108, as explicated by *Spinelli v. United States,* 393 U. S. 410.

The interpretations placed by the Twelfth Century Glossators upon the Institutes of Gaius and Justinian were not more extensive than have been our commen-

taries upon *Aguilar* and *Spinelli*. See, for example, *Dawson v. State*, 11 Md. App. 694; *Moore v. State*, 13 Md. App. 711; *Holland v. State*, 13 Md. App. 635; *Dawson v. State*, 14 Md. App. 18; *Hudson v. State*, 16 Md. App. 49; *Kraft v. State*, 16 Md. App. 347; *Lomax v. State,* 16 Md. App. 502; *King and Mobley v. State,* 16 Md. App. 546; *Thompson v. State,* 16 Md. App. 560.

We look first to the Aguilarian mandate that Officer Womack have furnished to the trial court, in this case in the course of a pretrial suppression hearing, "some of the underlying circumstances from which the officer concluded that the informant . . . was 'credible' or his information 'reliable.' " *Aguilar,* at 114. It is the "credibility" aspect which concerns us here.[2]

## A. *Credibility of Informant*

Officer Womack detailed for the trial court, at the suppression hearing, that he had worked with his informant for a number of months. On many occasions, he had received information from his informant as to narcotics activity within the Washington metropolitan area. This information included names, addresses and modes of operation of a number of known narcotics dealers in Washington. Some of this information was already known by Officer Womack. His own information agreed with that furnished by the informant. Other information, not known to Officer Womack, was checked out by him and found to be true. On one occasion, the informant alerted Officer Womack to a private residence where drugs were being sold. Officer Womack went with the informant to the vicinity of that residence. The officer searched the informant and found him to be free of any drugs or money. He then handed money to the informant and instructed him to go into the premises and to purchase narcotic drugs. The informant did so. An

---

2. See *Thompson v. State*, 16 Md. App. 560 for a discussion of "informational reliability" as distinguished from an informant's "credibility."

arrest was made as a result of this activity, and a large quantity of high-grade heroin was seized under a search warrant, which was based upon this same activity. Officer Womack indicated that he had received reliable information from the informant on more than twenty occasions.

We conclude, as did Judge Powers, that Officer Womack had shown his informant to be "credible." *Dawson v. State,* 14 Md. App. 18; *Moore v. State, supra; Holland v. State, supra.*

As will be referred to more fully in our discussion of the ultimate question of probable cause, Officer Womack had, in addition, independent knowledge which verified in part the story told by the informant. We deliberately eschew detailing that knowledge at this point, however, so as not to water down our holding that the internal recitation alone about the informant was sufficient to establish his credibility intrinsically. *Dawson v. State,* 14 Md. App. at 32-35. *Spinelli* described the buttressing technique, at 415:

> "If the tip is found inadequate under *Aguilar,* the other allegations which corroborate the information contained in the hearsay report should then be considered. At this stage as well, however, the standards enunciated in *Aguilar* must inform the magistrate's decision. He must ask: Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration?"

The tip not having been "found inadequate under *Aguilar,*" the extrinsic corroboration is redundant in this context.

B. *Basis of Knowledge: Self-Verifying Detail*

The "basis of knowledge" prong of *Aguilar's* "two-pronged" test requires that the officer pass on to the

trial judge "some of the underlying circumstances from which the informant concluded" that the evidence was where he claimed it would be. *Aguilar*, at 114. At one point in his cross-examination at the suppression hearing, Officer Womack gave the general response that his informant was speaking on the basis of personal knowledge. In his lengthier recital in chief of the information passed on to him by the informant, however, Officer Womack never established the pedigree of the information. We lack the direct and explicit reassurances that could remove all doubt: "The informant told me that which he saw with his own eyes; that which he heard with his own ears; that which he touched with his own fingers; that which he smelled with his own nose." Even failing such explicit reference to the observations of the informant's own senses, we are yet not bereft. *Spinelli* points out that if the information is furnished in sufficient detail, it may, under *Draper v. United States,* 358 U. S. 307, be "self-verifying," on the theory that only a first-hand observer could ever possess such minute detail. It said, at 416-417:

> "In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation.
> . . . A magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way."

Measuring the hearsay information at bar against the "suitable benchmark" of *Draper,* as explicated by *Spinelli,* we conclude that it was sufficiently detailed to be "self-verifying"—sufficiently detailed to make implicit what

had not been made explicit: that the informant spoke from personal knowledge.

The informant described the appellant in the following detail:

"A. The source described Mr. Soles. He gave— told me that the name of the subject was Soles. He didn't know any other name. Just Soles. He described Mr. Soles as being approximately five foot eight inches in height, approximately 160 pounds, as being a Negro male, approximately in his early 30's. I believe one age was 35 years of age. He said he had a receding hairline slightly, a small bush cut. He said his hair wasn't a big bush. He said it was short. He said he had a goatee and he was light skinned."

The informant described the appellant's automobile in the following detail:

"A. It was a late model blue convertible with a white top bearing New York tags, I believe WQ 9579, something like that; WX 9579. My recollection isn't real good on that."

The informant described the operation generally and the cocaine specifically in the following detail:

"THE WITNESS: The source called me at home and related to me that he had information about a male subject from New York who was a major distributor of cocaine to several known narcotics dealers in Washington. He related to me that this source was named Soles. He also indicated to me that he had given the tag number of Soles' car to my partner, Officer Robert Polzin, earlier that week, and in the conversation with this source he related to me that Soles had in excess of an eighth of a kilo of cocaine in his trunk of his car inside a briefcase. He said this cocaine would be inside a glass jar.

He stated that Soles had several thousand dollars in cash on him, which were the assets from the sale of part of the cocaine he brought down from New York. He stated he was armed with a pistol, and stated that he would be leaving Washington for New York before three o'clock that evening."

The trial judge, "when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way," *Spinelli*, at 417,— that is, via first-hand observation. Upon our independent review, we draw such an inference.

## C. *The Ultimate Question of Probable Cause*

The informant having been found "credible" and a sound "basis of knowledge" having been established for his information, that information is properly in the probable cause equation.

Officer Womack had, therefore, properly credited and reliable information to the effect that Soles (named and minutely described) was a major distributor of hard-core narcotics out of New York to several known narcotics dealers in Washington. He had information that Soles would be leaving 30 Sheridan Street to return to New York in a late model blue convertible with a white top bearing New York tags WQ 9579 or WX 9579 at some time "before 3 o'clock" during the early morning of September 19, 1971. He had information that "in excess of an eighth of a kilo of cocaine" would be inside a glass jar inside a briefcase inside the trunk of the automobile. He had information that Soles would be carrying several thousand dollars in cash, which were assets from the sale of drugs in Washington. He had information that Soles would be armed with a pistol.

Three additional items of independent police information, although purely cumulative in their ancillary function of verifying the credibility of an informant whose

credibility needed no further verification, are now properly considered in their primary function of contributing directly and substantively to the sum total of probable cause.

1. Officer Robert Polzin, a colleague of Officer Womack, had, pursuant to confidential information which had been furnished to him, visited the unit block of Sheridan Street either three or four days prior to September 19. The information furnished to Officer Polzin, not meeting the standards of *Aguilar,* will not be considered. Regardless of what prompted Officer Polzin to go to that unit block of Sheridan Street, however, he did personally observe an automobile parked in that block in close proximity to 30 Sheridan Street, which matched in every detail that of the appellant. That personal observation will be considered.

2. Officer Womack knew, of his own knowledge, that 30 Sheridan Street was the residence of one Joyce Jones, otherwise known as "Stud Joe." [3] He knew Joyce Jones to be a "major narcotics distributor in Washington." He knew that the Narcotics Squad of the Metropolitan Police Department had arrested Miss Jones on a number of occasions for narcotics violations.

3. At some time between 2:15 and 2:30 a.m. on September 19, the police team arrived on station. Officer Polzin, along with Sgt. Alan Simmers, was in plain clothes and parked in an unmarked car close enough to observe 30 Sheridan Street. Officer Womack, with a uniformed officer at the wheel, was in a marked police vehicle several blocks away. Both vehicles were in constant radio communication with each other. The appellant's car arrived and parked in front of 30 Sheridan Street at 2:40

---

3. The anomalous nickname triggered a quizzical double-take by Judge Powers. He was reassured as to gender:

    "THE COURT: What was the nickname?
    THE WITNESS: Stud Joe.
    THE COURT: S-t-u-d?
    THE WITNESS: Yes.
    THE COURT: And it's a female?
    THE WITNESS: Yes, sir."

a.m. A male figure was seen to enter the house. The appellant left the house ten minutes later and entered the car. He drove for several blocks on Sheridan Street, turned onto Eastern Avenue, and within several blocks was at the Maryland line at the point where Eastern Avenue meets New Hampshire Avenue. He turned northbound onto New Hampshire Avenue. By that time, the marked police vehicle, in which Officer Womack was riding, had maneuvered into position behind Officer Polzin's unmarked police car which was "tailing" the appellant. Officer Womack's vehicle moved forward and immediately intercepted the appellant's vehicle. The appellant, matching his description, was at the wheel.

We are persuaded that at that point, which is the relevant point for measurement, Officer Womack had probable cause to believe that the appellant's automobile contained cocaine and other evidence of narcotics violations.

### Exigent Circumstances

Probable cause having been established, we look to the question of exigency. On the record before us, the only information properly available to the police prior to 12:30 a.m. on September 19, was that a late model blue convertible with New York license tags was on a single occasion parked in the unit block of Sheridan Street. That was palpably not enough to establish probable cause for an automobile search. The threshold of probable cause was crossed only with the call to Officer Womack at 12:30 a.m. on September 19. At that point, Womack was at his home in Alexandria. Officer Polzin was also at home. The information from the informant was that the appellant would be moving at some time "before 3 a.m." Even in the face of such exigency, Officer Polzin placed a telephone call to Assistant United States Attorney Robert Crimmins, who was at home in bed. Mr. Crimmins advised the officer to proceed against the appellant and his automobile without a warrant. Mr.

Crimmins testified at the suppression hearing. He testified that the obtaining of a search warrant in the middle of the night in the District of Columbia would probably take between two and three hours. He stated that, under ideal conditions, it would take an absolute minimum of one hour. He pointed out that the officers in this case would have had to get dressed and then driven to their headquarters to begin typing up an affidavit. He outlined the necessity for then going to the Superior Court Building to try to locate the necessary warrant forms. He then pointed out that the officers would have to ascertain the identity of and make contact with the "nighttime judge." The officers would then have to travel to that judge's home to present the warrant application to him.

It is clear to us that Officer Womack and Officer Polzin were faced with exigent circumstances, not only permitting but demanding immediate action.

The appellant's reliance upon *Coolidge v. New Hampshire, supra,* is totally misplaced. As we have said in *Peterson, Deal and Hunt v. State, supra,* 491-493; again in *Bailey v. State,* 16 Md. App. 83, 102-108; again in *Skinner v. State,* 16 Md. App. 116, 118-121; and again in *King and Mobley v. State, supra, Coolidge,* on the question of non-exigency, was dealing with an extreme situation where a defective warrant was actually obtained, so that the police claim of inability to obtain a warrant, as predicate for a warrantless search, was demonstrably untenable. On the question of automobile searches, *Coolidge* stood on its own facts.[4]

### The Arrest

The appellant's claim that his arrest was so egregiously faulty as to require that his convictions be vitiated is without merit to the fourth power.

---

4. We do not necessarily subscribe to the comment of Professor Max Radin that when courts note that another case "stood on its own facts" the courts are "administering euthanasia to their nonviable progeny." 6 St. John's Law Qu. Rev. 157. *Coolidge,* to be sure, is not our progeny, but that of the Supreme Court.

1. He now attacks the failure of the arresting officers to comply with the provisions of Article 27, Section 596, requiring out-of-state officers making a "fresh pursuit" arrest in Maryland to take the arrestee, "without unnecessary delay, before a judge of the circuit court of the county . . . in which the arrest was made" for a "hearing for the purpose of determining the lawfulness of the arrest." The appellant did not raise this issue at the trial below and the point is not preserved for appellate review. Maryland Rule 1085.

2. Even had the point been preserved, the lawfulness of the arrest here would be totally irrelevant, since the search was predicated upon the "automobile exception" to the warrant requirement and not upon the "search incidental to a lawful arrest exception." No fruits of the arrest having been used in evidence, the legality of the arrest is immaterial. *Matthews v. State,* 237 Md. 384, 387-388; *Parker v. State,* 5 Md. App. 422; *King and Mobley v. State, supra.*

3. Even had the point been preserved and even were the issue material, the provisions of Section 596 would not apply to the case at bar in any event. Sections 595 through 602 of Article 27 represent Maryland's embodiment of the Uniform Act on Fresh Pursuit.[5] In *Boddie v. State,* 6 Md. App. 523, 530-535, we interpreted the Uniform Act on Fresh Pursuit as there embodied in the laws of the District of Columbia.[6] In that case, we held the Fresh Pursuit Act to be applicable to a situation where Maryland officers pursued a fleeing felon into the District of Columbia, arrested him there, and then returned him to Maryland for trial. Chief Judge Murphy explained the purpose of the immediate magistrate's hearing contemplated by the Act as "determining the lawfulness of arrest" so that "the person [lawfully] arrested can be held for extradition proceedings." He characterized the provisions of the Act as "such as antici-

5. Enacted by Chapter 123 of the Acts of 1937.
6. D. C. Annotated Code, Title 23, Sections 501-504.

pate the eventual initiation of extradition proceedings and make preliminary provisions in furtherance thereof." The hearing provision contemplates the pursuing officers' returning their arrestee to the jurisdiction whence he departed. It guards against the arrestee being spirited out of the state where the arrest is made or being incarcerated therein pending extradition out of that state without a judicial determination as to the lawfulness of the arrest in the first instance.

The arresting officers here, however, were content (if not, indeed, eager) to submit the appellant to the judicial processes of Maryland for the crime of possession unquestionably committed by him in this State. Immediately after the arrest, the Washington officers requested Prince George's County officers to respond to the arrest scene. The contraband was seized by Officer Gerald Howard of Prince George's County. At that point, as part of the police team, Officer Howard had ample probable cause to believe the appellant guilty of felony in Maryland. The appellant was taken into custody by the Maryland authorities and all subsequent legal action against him was in Prince George's County pursuant to the laws of Maryland. No return to the District of Columbia having been sought or contemplated, the hearing provisions of Section 596 were simply inapplicable.

4. Even had the point been preserved and even were the issue material and even were the provisions of Section 596 applicable, non-compliance therewith would still not operate back to invalidate what had been a proper arrest when made. *Boddie* characterized the hearing requirement as "essentially procedural in nature." It held explicitly that non-compliance with "the procedural provisions of Section 502" (the District's counterpart of our Section 596) would not "vitiate the arrest, otherwise lawful."

In short, the appellant failed to object to an immaterial non-compliance with a merely procedural provision of an inapplicable law.

### The Refusal to Stage a Courtroom Lineup

To thwart in-court identification, the appellant attempted a bold gambit less out of the *Wade-Gilbert-Stovall* trilogy than out of Dumas's *Corsican Brothers* or Dickens's *Tale of Two Cities.* He proposed that he be placed among the spectators in the courtroom and that prosecution witnesses be required to pick him out from the crowd. Judge Powers denied the motion, noting, as did the State, that a person, apparently the appellant's brother, was seated in that courtroom who was a "dead ringer" for the appellant. Judge Powers observed that he would be unable to tell the one from the other, were one to take the other's place at the trial table. He noted further that identification as such is not properly a critical issue where the police catch a person red-handed, arrest him, identify him, and then release him on bond to appear when called for trial. It is the obligation of that person to appear when summonsed and to answer to his name. To substitute a "dead ringer"—or, as Judge Powers put it, a "look alike" produced "by a clever Hollywood make-up man"—would be to perpetrate a fraud upon the court. Our predilections notwithstanding, it is not to exonerate Charles Darnay to insinuate Sidney Carton into the dock in his stead. It was certainly no abuse of the broad discretion described by *Alston v. State,* 11 Md. App. 624, 629-630, and *Cummings v. State,* 7 Md. App. 687, 691, to deny the appellant's request under the exotic circumstances of its being made here.

### The Sufficiency of the Evidence

#### A. *Possession of Cocaine with Intent to Distribute*

The appellant was in exclusive possession of 82 grams of cocaine of a 10.2% concentration, which was found in a jar inside his briefcase. He was also in exclusive possession of 61 grams of cocaine, of a 10.2% concentration found inside a plastic Baggie inside his briefcase. He was also in exclusive possession of 6.3 grams of cocaine,

of a 7.7% concentration found at another spot in the trunk of his automobile. The testimony revealed that this quantity and quality of cocaine would yield approximately 3,240 "dime bags" which would sell "on the streets" for approximately $32,400.[7] The appellant was also in exclusive control of between 200 and 250 glassine bags, appropriate for the packaging of illicit cocaine. The appellant was also in control of two strainers, a plastic playing card, and a box of aluminum foil, all appropriate implements in a cutting and packaging operation. The appellant was also in exclusive control of a one pound box of dextrose, which is used to "cut" or adulterate cocaine. Also recovered from the bottom of a clothes bag in the trunk of the automobile was $6700 in cash. The appellant, furthermore, in the course of the attempted bribery, volunteered the following to Officer Howard, "What do you want to do this to me for? I'm only a small man. If you will just let me take my briefcase, you two can split the money on the table."

The appellant, in argument, candidly premises his contention in this regard upon the condition, "that if this Court finds the arrest, search, and seizure illegal, as conducted by either D.C. or Maryland police officers, there was insufficient evidence of probative value pre-

7. The physical evidence speaks for itself and it is beyond the scope of appellate review to try to make sense of the often convoluted windings of the traffic in illicit drugs. For academic purposes, however, the one fact that does not fit neatly into place is that of a seller of New York-based cocaine carrying part of the cocaine back to New York unsold. The hypothesis that the market was bearish is doubtful in the extreme. A more likely hypothesis is that it was heroin which was carried from New York to Washington for distribution and that the cocaine was picked up in Washington and was destined for delivery to New York. The typical route for East Coast-consumed heroin is out of the Levant by way of France to New York (directly or via Montreal) and then southbound to the retail markets. Conversely, the typical route for cocaine is out of Latin America by way of New Orleans and Miami and then northbound to the northeastern metropolises. The same trusted couriers who sell heroin south may do double duty, instead of "deadheading" it home, and deliver cocaine north. The question of what would ultimately have happened to the cocaine in the appellant's automobile is, however, for present purposes only academic.

sented to sustain the conviction." We, of course, found the arrest, the search and the seizure to have been legal. The appellant's contention falls with its factual premise.

He additionally grasps at the straw that Judge Powers, at one point in making his findings, used the word "opium" instead of "cocaine." It is clear to us that this was an inadvertent slip of the tongue. We feel, as did the Court of Appeals under similar circumstances in *Nance v. Gall,* 187 Md. 656, at 674:

> "In the charge to the jury the court referred to the proceeding as a case of false imprisonment. Thereafter it corrected this and told the jury that it was a case of malicious prosecution and not one of false imprisonment. The exception as to this is based on what we might call the slip of the tongue of the trial court. It is trivial and totally without merit."

## B. *Attempted Bribery*

At approximately 4 a.m. on September 19, the appellant was being processed at the Prince George's County Police Station. The $6700 in cash had been counted out in stacks and was sitting upon a table. At one point, the appellant spoke confidentially to Officer Womack. He informed him, "I know how to take care of the police." With reference to the police, the appellant inquired, "How many is there?" The appellant told Officer Womack that he could keep the $6700 on the table and that the appellant could even raise a little extra money for them from New York if the officers would just allow him to take his briefcase and its contents and go. He even indicated that he would acquiesce in having a charge placed against him for the possession of a gun just so long as there were no narcotics charges and just so long as the seized cocaine was not confiscated. Officer Womack told the appellant that he would have to think about it. Shortly thereafter, Officer Womack and Officer Howard

approached the appellant together. Womack told the appellant, "This is a two-way split." The appellant repeated his offer to both officers and indicated that they could split the $6700 plus some additional money he could raise in New York. It was at this point that the appellant said, "Why did you arrest me. I'm not the big man. I'm nobody." The two officers said that they could not act without the acquiescence of Sgt. Simmers. At that point, the appellant said that he could get at least $2000 more from New York if the officers could wait until Monday. Shortly thereafter, Sgt. Simmers approached the appellant, with the other two officers. The appellant queried him, "Did he tell you about the deal?" Officer Womack told the appellant, "Just make it short. Tell him briefly what we want to do." The appellant repeated the entire offer. The evidence of attempted bribery could hardly be more complete.

The appellant seeks solace in *Sugarman v. State,* 173 Md. 52, and in its implication that an attempt to bribe an officer who was making an illegal arrest is not a crime under Article 27, Section 23. Even if there is any continuing vitality in this suggestion from *Sugarman,*[8]

---

8. *Sugarman* overturned a lottery conviction by a 4 to 2 split decision, with Chief Judge Bond and Judge Urner dissenting. The decision was in 1937 and is a treasure chest of now-discarded principles. The Fourth Amendment was, of course, an irrelevancy and would remain so for another 24 years. The case turned upon such questions as the non-recognition by the common law of such a thing as a pre-trial suppression hearing, upon the applicability of the Bouse Act, upon the jury hearing testimony which would today go only to the issue of probable cause and upon the non-recognition by the common law or by the laws of this State of the very device of a search warrant for an automobile. The broad principle for which *Sugarman* is here cited—that an officer making an unlawful arrest is acting "contrary to his duty" and is therefore (1) incapable of being bribed by the arrestee and (2) an appropriate subject for "such force as is reasonably necessary" for the arrestee "to effect his escape"—was from a time when close constitutional calculations would not nullify an apparently good arrest procedure. In *Sugarman,* moreover, there was no bribery conviction or attempted bribery conviction actually under review. The whole business of an at-best ambiguous bribery offer was before the court in the oblique capacity of an oral admission which, the State urged, might escalate an abjectly inadequate first arrest into a proper second arrest, based upon that offer and upon attempted

it will avail the appellant naught. As we have held, the initial arrest of the appellant by Officer Womack was lawful. Moreover, any arguable non-compliance with Article 27, Section 596, by Officer Womack could in no way affect the propriety of the appellant's custody in the hands of Officer Howard of Prince George's County. Moreover, the criminal offer of the appellant went not simply to the question of his own freedom but (1) to the question of what charges would be placed against him and what would not and (2) to the turning over to him of properly seized contraband drugs. The *corpus delicti* of attempted bribery is not to be doubted.

*Judgments affirmed.*

---

flight. As boldly as a single sentence or two may come down for appellant's present purposes, the factual and legal foundations for those sentences are treacherously anachronistic.