JAMES RAYMOND WATSON AND NAYSI HARRIS
*v.* STATE OF MARYLAND

[No. 305, September Term, 1972.]

*Decided July 3, 1973.*

The cause was argued before THOMPSON, MOYLAN and DAVIDSON, JJ.

*Phillip Leventhal* and *Gary R. Alexander*, with whom were *Giordano, Alexander, Haas & Mahoney* on the brief, for appellants.

*Gary Melick, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County*, and *Edward P. Neal, Assistant State's Attorney for Prince George's County*, on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court. DAVIDSON, J., dissents and filed a dissenting opinion at page 198 *infra*.

The appellants, James Raymond Watson and Naysi Harris, were both convicted in the Circuit Court for Prince George's County by a jury, presided over by Judge Robert B. Mathias, of possession of marihuana and of receiving a stolen television set belonging to the Colony 7 Motor Inn. Watson was, in addition, convicted of a combined burglary and armed robbery perpetrated against Mr. and Mrs. Robert Reed Wallace. Harris was convicted of receiving stolen goods taken from the Wallaces. Watson, upon this appeal, contends:

186

(1) That he was subjected to an unconstitutional search and seizure;

(2) That he was subjected to an unconstitutional arrest in the District of Columbia; and

(3) That the evidence was legally insufficient to sustain the charges of possession of marihuana and of receiving the stolen goods taken from the Colony 7 Motel.

Harris joins in contentions 1 and 3.

### The Search and Seizure

At approximately 12:30 a.m. on Sunday, February 14, 1971, a combination burglary and armed robbery was committed by two persons at the apartment of Mr. and Mrs. Robert R. Wallace, Jr., in Suitland, Maryland. A 16-year-old son, Robert R. Wallace, III, was at home and was the victim of the robbery. On February 24, 1971, Detective Vincent Raubaugh of the Prince George's County Police Department was issued a search warrant for apartment 202, 5200 Livingston Terrace, Oxon Hill, Maryland. The supporting affidavit of Detective Raubaugh read as follows:

> "I, Vincent Ronald Raubaugh, am a Detective of the Prince George's County Maryland Police Department. I am assigned to the Criminal Investigation Division, Robbery Squad, and am assigned to the Seat Pleasant Station. On this date I have personally interviewed Robert Reed Wallace, Jr., and his statement to me has been reduced to affidavit form. His affidavit has been attached hereto, and is made a part hereof by reference.
>
> I have contacted the Metropolitan Police of the District of Columbia and have determined that D.C. tag 811-432 is listed to James Raymond Watson, Jr., and is listed for a 1967 Thunderbird. From the same source I have determined that D.C. license #753-528 is listed to a 1969 Lincoln Mark III owned by James Raymond Watson, Jr.
>
> Based on this information I believe that the property stolen from Mr. Wallace is now located at the premises for which this warrant is sought."

The supporting affidavit of Robert R. Wallace, Jr., read as follows:

"I, Robert Reed Wallace, Jr., live at 4248 Suitland Road, Suitland, Prince George's County, Maryland, apartment 201. On February 13, 1971, at about midnight, I left my apartment with my wife and went out, leaving the apartment in the care of my son, Robert Reed Wallace, III. My son is sixteen years old. At about one A.M. on the morning of February 14, 1971, I was summoned to return to my home. Upon my return, I talked to my son. He told me that he answered a knock at the door. When he did, he was faced by a man who forced his way in, produced a gun, and asked where the money and jewelry were. He said he would 'burn' him if he didn't tell. He took him to the bedroom, tied him, then took him to the bathroom and put a pillowcase over his head. The man then called a second man into the apartment.

My son stated to me that he had overheard the conversation and thought he recognized the voice of the second man as being someone he had heard me talk to. My son stated that when he heard the men leave, he got loose and ran and locked the front door. He then ran to the window and saw a 1967 light green Thunderbird. He stated to me that he recognized the car as 'Inkydink's' Thunderbird. 'Inkydink' is a nickname for James Watson, Jr. My son has been in the presence of James Watson on numerous occasions and would recognize the voice. Goods valued at approximately eight thousand dollars were taken, this being my property and that of my wife. Among other things taken were a portable color television, an RCA model EL 418, serial 6546; a red coat; a polaroid camera; a diamond faced Omega watch. The television was valued at approximately 329.00 dollars.

On February 18, 1971, a cousin of my wife, who lives in the area, called me to tell me that a man

had offered to sell her a coat. The description was similar to that of the one stolen, and she had become suspicious. I told her to proceed with the sale, and my wife and I were present when the sale was to be made. My wife recognized the coat as being hers. I talked with the man who was attempting to sell the coat. He stated to me that he had gotten the coat from 'Inkydink' at 'Inkydink's' apartment. He told me that he had been inside and had seen this coat there, that he had seen two color television sets, a gray coat, and a diamond watch of the same description as the one stolen from me.

Acting on this information, I went to 5200 Livingston Terrace, apartment 202, Oxon Hill, Prince George's County, Maryland. I know this to be the address of 'Inkydink' because I have visited him there. Although the name Harris appears on the door, I know from personal experience that this apartment is occupied by James Raymond Watson, Jr. At that time, I saw a green 1967 Thunderbird parked in front. I took that license number, D.C. 811-432 and have given it to Detective Raubaugh. I know Mr. Watson owns a 1969 Lincoln, and saw that vehicle parked in front of 5200 Livingston Terrace, Oxon Hill, Maryland. I took that license number, D.C. 753-528 and gave it to Detective Raubaugh.

The aforegoing is true to the best of my knowledge and belief, and is given in support of the application of Detective Raubaugh for a search warrant."

Items seized from the apartment when the warrant was executed tied Watson in with the burglary-robbery and formed the basis for the receiving convictions against both appellants. The appellants filed a pretrial Motion to Suppress the evidence as unconstitutionally seized. Their motion was denied. The issue before us is whether the warrant application establishes good probable cause for the search of the apartment and the seizure of goods therefrom.

It is axiomatic that in analyzing the probable cause for the issuance of a search warrant, we are confined to the four corners of the affidavit itself. *Smith v. State,* 191 Md. 329, 335, 62 A. 2d 287; *Sessoms v. State,* 3 Md. App. 293, 296-297, 239 A. 2d 118; *Dawson v. State,* 11 Md. App. 694, 714-715, 276 A. 2d 680.

Aside from determining that two license tags in question were listed to automobiles owned by Watson, the affidavit of Detective Raubaugh was simply formal in nature. The probable cause must be sought in the affidavit of Robert Wallace, Jr. With respect to Wallace, there was no credibility problem since the oath served as the guarantee of credibility. The great bulk of the substance contained in Wallace's affidavit, however, came to him from a number of secondary sources — 1) his son, 2) his wife, 3) a cousin of his wife, and 4) an anonymous man who had attempted to peddle his wife's stolen coat. Before we can accept the information passed on from those secondary sources, we must subject those sources, not themselves under oath, to the two-pronged test mandated by *Aguilar v. Texas,* 378 U. S. 108, 84 S. Ct. 1509, 12 L.Ed.2d 723, in order to determine whether 1) they were "credible" or their information otherwise "reliable" and 2) whether there was a sound "basis of knowledge" for their conclusions.

The *Aguilarian* adequacy of the cousin's hearsay report is irrelevant, since what she passed on, as a mere conduit from the unnamed coat peddler, was later repeated by the peddler to the affiant Wallace himself. The cousin's earlier version, in scantier detail, became a redundancy.

The second-hand information from the wife consisted simply of the wife's recognition of her own recently stolen coat as it was offered for sale by the unnamed peddler. Her "basis of knowledge" under *Aguilar* is not to be doubted as she observed directly the coat she knew to be her own. Her very status — wife of the affiant and victim of the theft — and her being named — Mrs. Robert Wallace, Jr. (by necessary implication) — establishes her "credibility" under *Aguilar. King v. State,* 16 Md. App. 546, 298 A. 2d 446;

*Thompson v. State,* 16 Md. App. 560, 298 A. 2d 458; *Dawson v. State,* 14 Md. App. 18, 33-34, 284 A. 2d 861.

The 16-year-old son similarly surmounts *Aguilar's* "credibility" hurdle — as Robert Reed Wallace, III, witness and victim of armed robbery. Nor is there any doubt that the son had a sound "basis of knowledge" — passing on only those things which he himself saw with his own eyes and heard with his own ears. Our first real analytical problem is to determine what can properly be made of the son's observations in terms of probable cause.

In making that determination, we are animated by the philosophy permeating the opinions of the Supreme Court on the spirit in which applications for warrants must be reviewed. As that Court said in *United States v. Ventresca,* 380 U. S. 102, at 108, 85 S. Ct. 741, at 746, 13 L.Ed.2d 684:

> "These decisions reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting."

In *Aguilar v. Texas,* 378 U. S. 108, 84 S. Ct. 1509, 12 L.Ed.2d 723, the Supreme Court pointed out that the preference for warrants is so marked, that less persuasive evidence will justify the issuance of a warrant than would justify a warrantless search or warrantless arrest.[1] As the Court there said, at 378 U. S. 111:

---

1. The definition of "probable cause" remains a constant, of course,

"Thus, when a search is based upon a magistrate's, rather than a police officer's, determination of probable cause, the reviewing courts will accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant,' ibid., and will sustain the judicial determination so long as 'there was substantial basis for [the magistrate] to conclude that narcotics were probably present. . . .'."

This preference was reiterated in *Ventresca,* 380 U. S. at 109:

"However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. *Jones v. United States, supra,* 362 U. S. [257], at 270, [80 S. Ct. 725, at 735, 4 L.Ed.2d 697, at 707, 78 A.L.R.2d 233]."

See also *Henderson v. State,* 243 Md. 342, 221 A. 2d 76; *Tucker v. State,* 244 Md. 488, 224 A. 2d 111; *Scott v. State,* 4 Md. App. 482, 243 A. 2d 609; *Hall v. State,* 5 Md. App. 394, 247 A. 2d 548; *Johnson v. State,* 8 Md. App. 187, 259 A. 2d 97; *State v. Swales,* 12 Md. App. 69, 73-74, 277 A. 2d 449.

In that spirit, we look at the observations of the son as recited by his affiant father. The son answered a knock at the door and was met by an armed stranger who asked him where the money and jewelry were (thereby suggesting that

applying alike to searches and to arrests, with warrants or without warrants. The "preference" is rather a rule of construction for the resolution of "doubtful or marginal cases."

the robbers had some familiarity with the Wallaces and their worldly goods). The son was threatened with "burning" if he did not reveal the hiding place, was bound, and was put in the bathroom with a pillowcase over his head (strongly suggesting that the confederate yet to enter the apartment feared being recognized, since the stranger who led the interference had taken no steps to conceal his own appearance). The second man then entered the apartment.

The son could overhear the conversation that ensued and he thought that he recognized the voice of the second man as that of someone he had heard his father talk to. (The affiant father recited that his son had, on numerous occasions, been in the presence of the appellant Watson in company with the father, and would recognize Watson's voice.) When the son heard the robbers leave, he immediately got loose and ran to the window. He saw a 1967 light green Thunderbird. (The affiant father confirmed that the appellant Watson owned a 1967 green Thunderbird. Detective Raubaugh independently confirmed that Watson owned a 1967 Thunderbird.) The son recognized the car as " 'Inkydink's' Thunderbird." (The father established that the appellant Watson was nicknamed "Inkydink" and was so known to his son.)

Even without looking ahead to the story of the unnamed peddler that items stolen in the course of this robbery were within four days observed in Watson's apartment, but remembering that probable cause "means less than evidence which would justify" conviction, *Locke v. United States*, 11 U. S. 339, 348, 3 L. Ed. 364, we believe, upon our constitutionally mandated review, that the observations of the son establish a reasonable probability that the appellant Watson was the second robber.

We look finally to the unnamed coat peddler. We know nothing about him — his track record or his reputation for truth speaking, his very identity or his status. His "credibility" under *Aguilar* is absolute zero. Nor is there anything in the circumstances of his confrontation with the affiant Wallace which would reasonably insure trustworthiness — which might show informational "reliability" even absent demonstrated "credibility." See

*Thompson v. State, supra.* His situation was defensive as he faced an actual or potential accuser. He could well have had a natural inclination to deflect blame away from himself. He abjectly failed to measure up against *Aguilar's* "veracity" prong in either of its alternative aspects.

That initial failure, however, does not end the inquiry. *Spinelli v. United States,* 393 U. S. 410, 89 S. Ct. 584, 21 L.Ed.2d 637, points out an alternative route to the establishment of "credibility" or "veracity" in an informant. Even where, under traditional *Aguilarian* analysis, the internal evidence about the informant himself, or about the circumstances under which the information was furnished, fails to establish intrinsically either personal "credibility" or informational "reliability," external evidence, contained elsewhere in the application, may be examined to see what buttressing it provides. Independent observation may tend to verify — to corroborate — the story as told by the informant. A showing that some of the story has been verified as true lends credence to the remaining unverified portions of the story. *Hignut v. State,* 17 Md. App. 399, 303 A. 2d 173; *Dawson v. State,* 14 Md. App. 18, 41-42, 284 A. 2d 861. *Spinelli* described the buttressing process, at 393 U. S. 415:

> "If the tip is found inadequate under *Aguilar,* the other allegations which corroborate the information contained in the hearsay report should then be considered. At this stage as well, however, the standards enunciated in *Aguilar* must inform the magistrate's decision. He must ask: Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration? "

We now turn the lens of *Spinelli* upon the story of the unnamed peddler. The peddler claimed that he had gotten Mrs. Wallace's stolen coat from "Inkydink" at "Inkydink's" apartment. He said that he had seen there, among other things, a color television set and a diamond watch. The affiant Wallace confirmed that a color television set and a

diamond watch, matching the description given by the peddler, had been taken in the same robbery that saw the loss of Mrs. Wallace's coat. The son, at the very least, placed "Inkydink's" 1967 Thunderbird at the robbery scene. The son may well have established, in addition, the voice of the second robber as that of "Inkydink." Independent information established that "Inkydink" was familiar enough with the Wallaces to direct the criminal effort toward specific, more valuable chattels. Independent information established that "Inkydink" would have had need to delay his entrance onto the crime stage until the confederate had hooded the victim who might otherwise have recognized him. We think the unnamed peddler's identification of "Inkydink" as the holder of the stolen goods was sufficiently "corroborated by independent sources," with respect to "certain parts" of his story, so as to be "as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration." *Spinelli,* at 393 U. S. 415. As to the unnamed peddler's "basis of knowledge," it is clear that he spoke from first-hand observation.

Looking at the warrant application as a whole, we are persuaded that it established probable cause to believe that fruits and other evidence of the crime would be found in the appellant Watson's apartment. The warrant, therefore, properly issued.

### The Arrest of Watson

The appellant Watson claims that he was subjected to an unconstitutional arrest in the District of Columbia by Maryland officers who were not "in fresh pursuit." We do not need to rely upon Maryland Rule 1085 and to point out that the issue was not raised below and is not, therefore, preserved for appellate review. Since no fruits flowed from that arrest, the manner of its execution is palpably immaterial. *Matthews v. State,* 237 Md. 384, 387-388, 206 A. 2d 714; *Parker v. State,* 5 Md. App. 422, 247 A. 2d 552; *King v. State, supra,* 16 Md. App. at 548; *Soles v. State,* 16 Md. App. 656, 669, 299 A. 2d 502.

*The Legal Sufficiency of the Evidence*

*Possession of Marihuana*

## A. *Failure of the State to Offer the Marihuana Itself*

Both appellants complain that the marihuana which was recovered by the police was not physically introduced into evidence. They contend that this makes the evidence against them legally insufficient. Their theory of evidence seems to be: "That is the way it is usually done; therefore, that is the way it must be done." Proof of the element of possession, as proof of any other fact, may be by testimonial evidence as well as by real evidence. Proving the *corpus delicti* in a possession case no more requires the physical introduction of the thing possessed, as a *sine qua non*, than proving the *corpus delicti* in an automobile theft case requires the physical introduction into evidence of the automobile itself or proving the *corpus delicti* in a murder case requires the physical offering of the corpse itself. Detective Wright recovered a brown paper bag full of suspected marihuana. He turned it over to Detective Snow who performed a field test on the spot which confirmed that the substance was, indeed, marihuana. The substance was later forwarded to the United States chemist, whose fuller analysis confirmed that it was, indeed, five ounces of marihuana. From those facts, the jury could fairly be convinced, beyond a reasonable doubt, that the substance recovered was marihuana. Under the circumstances, the trial judge properly denied the motion for a judgment of acquittal and properly submitted the issue to the jury. *Williams v. State,* 5 Md. App. 450, 459, 247 A. 2d 731; *Metz v. State,* 9 Md. App. 15, 23, 262 A. 2d 331. That Detective Snow subsequently used up the marihuana for training purposes at the Police Academy, though an unusual wrinkle in a possession case, does not erode the legal sufficiency of the inculpatory evidence.

## B. *Possession as to Harris*

When the police proceeded to apartment 202, 5200 Livingston Terrace, Oxon Hill, to execute the search warrant

at 8:40 p.m. on February 24, 1971, the appellant Harris was alone in the apartment. The police rapped upon the door and announced themselves as police officers. They were denied entrance. They heard a scurry of activity within the apartment. Detective Raubaugh had had the foresight to station several officers to the rear of the building to cut off possible escape of the suspects. Detective Wright heard a window being opened, looked up and saw the appellant Harris throw out a brown paper bag. He did not so much seize it as catch it in self-defense, as it descended toward his head. The bag contained the five ounces of marihuana. Harris posits the unusual theory that the fleeting control necessary to drop the bag from the window does not constitute "possession" within the contemplation of the law. We cannot subscribe to her theory. She resided in the apartment whence the marihuana was thrown. She was alone in that apartment at the time it was thrown. She was the one to throw it. Any claim of belief in the innocuousness of the jettisoned bag would render her behavior, in the frantic moments before the police came through the front door, inexplicably bizarre. Guilty knowledge permeated her effort to dispose of the contraband. She may no more disclaim prior possession in the jettisoned marihuana than Tinker could have disclaimed erstwhile possession of the ball he passed on to Evers and Chance.

## C. *Possession as to Watson*

The appellant Watson was not present at the apartment at the time it was searched. His efforts to disassociate himself from its contents are, nevertheless, unavailing. There was evidence that he maintained two apartments — the one in question and another in the District of Columbia. There was evidence that he had been living at the Livingston Terrace apartment with the appellant Harris for between six months and one year. Watson admitted that he kept clothing and shoes at the apartment. This was substantiated by Harris. Watson admitted paying part of the rent. He admitted to Detective Raubaugh that he "stayed" at the apartment. Photographs of both appellants were found in the

apartment. Robert Wallace, Jr., testified, moreover, that he and the appellant Watson had been associated in the business of selling narcotics just prior to the crimes in question. There was further testimony that the appellant Watson had offered to give Wallace narcotics if Wallace would refrain from testifying against him at the trial now under review. Under all of the circumstances, we think the evidence permitted a finding that the appellant Watson had a possessory interest in the apartment and that he was in joint exclusive control of the contraband marihuana. See *Folk v. State*, 11 Md. App. 508, 275 A. 2d 184.

### The Legal Sufficiency of the Evidence

### Receiving Stolen Goods

The only question raised by both appellants as to the legal sufficiency of the evidence to sustain the conviction for receiving the television set stolen from the Colony 7 Motor Inn goes to the proof of value. The appellants were convicted and sentenced for receiving stolen goods of the value of $100 and upwards. William Pritcher, the manager of the Colony 7 Motor Inn in Laurel, testified that on January 4, 1971, a GE color television was stolen from room 510 of the motel. A check of the serial number confirmed that the GE color television set recovered from the appellants' apartment was that stolen on January 4.

There is some confusion as to the value of the stolen television set, confusion attributable in no small measure to the dogged unwillingness of counsel to let the witness tell his story. With every half line of testimony interrupted by half a page of lawyerly harangue, it was exceedingly difficult for the witness to develop his thesis and the search for truth was well nigh lost in the process. Enough information filtered through, however, to permit the jury to infer that the present market value was $100 or more. At one point, the following questions and answers slipped through the procedural lines:

"Q. What was the value of that television set?

. . . .

A. Three hundred fifty dollars.

Q. And was that the price you paid for it?

A. That is right."

At a later point, another but equally legally sufficient version got into evidence:

"Q. What was the price you paid per unit for the group of GE television sets?

. . . .

THE WITNESS: I cannot state exactly how much these sets cost us because at the time it was an arrangement on a rental basis. We have since purchased all these television sets.

Q. And on that rental basis what was the value of the set, this television set?

. . . .

THE WITNESS: I would say approximately — I can't give you the exact value — $245 a set, I believe."

It was clearly inferable that the witness was testifying as to purchase price. The confusion stemmed from a somewhat involved rental-purchase plan, which the witness was never permitted to explain. He did point out, however, that the sets had been "just installed throughout the motel." Even though purchase price is not the ultimate standard, we think it clear, under *Vucci v. State*, 13 Md. App. 694, 700-702, 284 A. 2d 646, that the jury could rationally infer that a recently installed television had not depreciated from either a $350 or a $245 starting point, as the case may have been, to a market value of less than $100. We find the evidence legally sufficient to sustain the convictions.

*Judgments affirmed.*

*Davidson, J., dissenting:*

I concur in the affirmance of appellant Harris's conviction for the possession of marijuana. I do not agree that the remaining convictions of appellants Harris and Watson should be affirmed.

## I

### The Search and Seizure

#### A. The Search Warrant

I disagree that probable cause for the issuance of the warrant exists in the instant case. I agree with the majority that the police officer, the victim, his wife, and his 16-year-old son all satisfy the credibility aspect of *Aguilar's* veracity prong. I do not agree that the factual premises in the form of direct observations furnished by them are sufficient to support the conclusion that appellant Watson was probably a participant in the crime. Moreover, I disagree that there was sufficient independent verification of the direct observations of the coatseller to satisfy the credibility aspect of *Aguilar's* veracity prong. I therefore believe that none of the hearsay information provided by him should be relied upon. I conclude that the affidavits fail to furnish probable cause to believe that the stolen goods were located at appellant Watson's alleged residence.

##### 1. The Sufficiency of the Factual Premises to Support the Conclusion that Probable Cause Exists

The majority finds "that the observations of the son [Robert Reed Wallace III] establish a reasonable probability that the appellant was the second robber." In reaching this result the majority initially relies on the statements of Robert Reed Wallace III, his father Robert Reed Wallace, Jr., and Detective Raubaugh. Robert Reed Wallace III was reported by his father to have said that he overheard a conversation between the two men who had entered the Wallace apartment about midnight on 13 February 1971, that he "thought he recognized the voice of the second man as being someone he had heard me [Robert Reed Wallace, Jr.] talk to," and that after the two men had left, he ran to a window and saw a 1967 light green Thunderbird that he recognized as the appellant's. Robert Reed Wallace, Jr., stated that his son had "been in the presence of James Watson on numerous occasions and would recognize the voice," and he further stated that he took the license number

of the 1967 green Thunderbird parked in front of James Watson's residence at 5200 Livingston Terrace and gave it to Detective Raubaugh. Detective Raubaugh stated that the tag number given to him by Wallace was listed in the District of Columbia as belonging to James Raymond Watson.

From the statements in the affidavits, the majority finds that Robert Reed Wallace III "may have established the voice of the robber as Inkydink [appellant Watson]." I find nothing to support that conclusion. The affidavits establish that Robert Reed Wallace III did not positively identify the voice he heard at the time of the commission of the crime as that of the appellant. Indeed, he was not even certain that he recognized the voice at all. He "thought" he did. These defects in identification are not cured by the fact that he was familiar with the appellant's voice and would recognize it. Rather, the latter fact raises an inference that it was not appellant's voice that Robert Reed Wallace III heard, for had he recognized the voice as that of Watson, he would undoubtedly have said so.

Moreover, this is not a case in which the absence of a clear and unequivocal statement of a critical fact can be excused because the affidavits were drawn "in the midst and haste of a criminal investigation." *United States v. Ventresca*, 380 U. S. 102, 108, 85 S. Ct. 741, 746 (1965). The affidavits here show that ten days elapsed between the date of the perpetration of the crime and the date of the application for the warrant, and that six days elapsed between the time of the alleged sale by the unnamed coatseller and the date of the application for the warrant. During this period, the son had ample time to refresh his recollection, to reflect, to discuss his observations with his father and the police, and to endeavor by every means possible to identify clearly the voice that he had heard. The police had ample time to prepare a proper affidavit. Under these circumstances, the failure of the son to make a positive identification of the voice as that of Watson's, coupled with the attempt of the father to fill the identification gap, leads me to believe that the affidavit did not just inartfully fail to reflect that the

son was able to recognize appellant's voice, but rather was deliberately written to state only as much as could in good conscience be represented. If during this period of time Robert Reed Wallace III had identified the voice he heard as Watson's, he should have said so. His failure so to do convinces me that he did not identify the voice. So far as I am concerned, the affidavit establishes that the son did not recognize the voice he heard as Watson's. Therefore the facts that he thought he recognized the voice as being someone he had heard his father talk to and that he would recognize Watson's voice lend no support either to the conclusion that Watson was probably the robber or that probable cause exists to search Watson's alleged residence.

The majority additionally relies on two "suggestions" arising from the statements of the reliable informants. It states that the fact that the first robber asked Robert Reed Wallace III "where the money and jewelry were" suggests that the robbers had some familiarity with the Wallaces and their worldly goods. Notwithstanding the absence of any direct statement in the affidavit showing that Watson knew anything whatsoever about the Wallaces' circumstances, this "suggestion" is nonetheless elevated to the status of "independent information" which establishes that "Inkydink was familiar enough with the Wallaces to direct the criminal effort towards specific, more valuable chattels." This transfigured suggestion is then treated as support for a further inference that Watson was probably the second robber. In my view an inquiry as to the whereabouts of money and jewelry is an ordinary, usual and frequent occurrence in any robbery. I can find nothing unique in the circumstances of this case which converts such an occurrence into a suggestion that the robber knows the victim and his circumstances. So far as I am concerned, there are no facts in or inferences drawable from the affidavit to show that either of the thieves was familiar with the Wallaces' circumstances. Therefore, the fact that the first robber asked where the money and jewelry were lends no support to the conclusion that Watson was in all probability the second robber or that probable cause exists that the stolen goods would be found in his alleged residence.

The majority next relies upon the fact that before the second robber entered the apartment, Robert Reed Wallace III was put in the bathroom with a pillowcase over his head. This circumstance, the majority says, "strongly suggest[s] that the confederate yet to enter the apartment feared being recognized, since the stranger who led the interference had taken no steps to conceal his own appearance." On the basis of information indicating that Watson was previously known to the Wallaces, they further conclude that independent information established "that Inkydink would have had need to delay his entrance onto the crime stage until the confederate had hooded his victim who might otherwise have recognized him." In my view, the fact that the second robber was not told to enter the apartment until after the son was hooded does not necessarily give rise to an inference that the second robber was previously known to the son. It is not uncommon for the degree of courage among thieves to vary substantially and for only one of two confederates, both previously unknown to the victim, to be willing to expose himself to the danger of subsequent identification. But even if such an inference were justified, the fact that Watson had previously been known to the Wallaces would not support the further inference that Watson was, in all probability, the second robber. At best, a coupling of the facts that the second robber was previously known to the Wallaces and that Watson was previously known to them lends credence to the possibility that Watson might have been the second thief.

In my view, the only observation offered by the credible informants tending to show a direct connection between appellant and the commission of the crime, and therefore between appellant and the stolen goods, consists of the fact that subsequent to the commission of the crime, Robert Reed Wallace III looked through a window and saw a car belonging to appellant. But he does not indicate precisely how much time had elapsed between the robbers' departure from the apartment and his seeing the automobile. He does not state that he saw Watson carrying the portable color television set, the red coat, the Polaroid camera, or any of

the other stolen goods valued at approximately $8,000; that he saw Watson or anyone else approaching, loading, getting into, sitting within, starting, or driving the car; or that he saw the car fleeing from the scene of the crime. Standing alone, the fact that appellant's car was observed at the scene of the crime at some time subsequent to its commission, a totally innocent circumstance unrelated in any way to any criminal activity, is "palpably insufficient" to establish a reasonable probability either that appellant was the thief or that the stolen goods would be found at his alleged residence. *Soles v. State,* 16 Md. App. 656, 667, 299 A. 2d 502, 509 (1973). The fact of the car's presence becomes little if any more adequate as support for a finding of probable cause when it is bolstered by evidence showing only that it was possible that appellant might be the thief.

I am mindful of the settled principles that probable cause requires only a probability and not a prima facie showing of criminal activity, that information in affidavits is tested by less rigorous standards than those governing the admissibility of evidence at trial, that warrants are to be interpreted in a common sense and not hypertechnical fashion, and that great deference should be paid to the determination of the issuing judge. *Hudson v. State,* 16 Md. App. 49, 56-57, 294 A. 2d 109, 113 (1972). Nevertheless, while probable cause is less than certainty or demonstration, it must be more than suspicion or possibility. *Taylor v. State,* 17 Md. App. 536, 544, 302 A. 2d 646, 650 (1973); *Cuffia v. State,* 14 Md. App. 521, 525, 287 A. 2d 319, 322 (1972); *Cleveland v. State,* 12 Md. App. 712, 718, 280 A. 2d 520, 523 (1971). When all is said and done, as I read these affidavits, they establish at best nothing more than that Watson's car was present at the scene of the crime at some time subsequent to its commission; that the thief was previously known to the Wallaces; and that Watson was previously known to the Wallaces. My common sense tells me that the combination of the otherwise innocent circumstance of Watson's car being present at the scene of a crime at a time subsequent to its commission, coupled with the fact that Watson falls within the class of persons who might have

committed the crime, does not add up to a reasonable probability that appellant was a participant in the crime or probable cause to believe that the stolen goods were located at the premises in which he allegedly resided.

## 2. The Credibility of the Unnamed Coatseller

Having concluded that there was a reasonable probability that the appellant Watson was the second robber, the majority next proceeds to rely on the information provided to the affiant Wallace by an unnamed coatseller. They find his credibility to be established by independent verification from the affiants' direct observations and rely upon his information in determining that there was probable cause to believe that the stolen goods were located at appellant Watson's alleged residence. Since I believe that there was insufficient independent verification to establish the unnamed coatseller's credibility, I think that none of the hearsay information provided by him could be relied upon.

The amount of verification needed to render an unnamed informer's information reliable varies depending upon what is known about him and the circumstances under which the information was offered. "How much verification is needed depends upon how much bolstering the credibility requires." *Hignut v. State,* 17 Md. App. 399, 411, 303 A. 2d 173, 179 (1973); *Dawson v. State,* 14 Md. App. 18, 41-42, 284 A. 2d 861, 873 (1971). More extensive verification is required to establish the credibility of an informant described merely as "reliable" than is needed for an informant described as "reliable and whose information has in the past led to arrests and convictions." Thus, in order to assess the constitutional adequacy of supporting data given to establish the veracity of the unnamed informant, we must look first to what the affidavits tell us about the informant himself and the circumstances under which his information was furnished.

In evaluating the credibility of the unnamed coatseller, the majority states that "we know nothing about him" and determines that his credibility under *Aguilar* is "absolute zero." The majority further recognizes that his "situation

was defensive" and that "he could well have had a natural inclination to deflect blame away from himself." They then conclude that he "abjectly failed" to demonstrate informational reliability.

But credible information contained in the affidavit establishes that the unnamed coatseller was in possession of goods stolen from the Wallaces' home only four days previously. No explanation for his possession of these goods appears in the affidavits. Under Maryland law, his unexplained possession of recently stolen goods supports the rational inference that he himself was the thief and an accomplice to the crime. *Devan v. State*, 17 Md. App. 182, 194-95, 300 A. 2d 705, 711-12 (1973); *Jones v. State*, 9 Md. App. 455, 460-61, 265 A. 2d 271, 274, *cert. denied*, 258 Md. 728 (1970). As such, his credibility, based on what we know about him from the affidavits themselves is so tarnished that if he were a witness at Watson's trial, his testimony, even under oath, would be insufficient to support a conviction without corroboration.[1] *Montgomery v. State*, 17 Md. App. 119, 124, 300 A. 2d 218, 221-22 (1973); *Early v. State*, 13 Md. App. 182, 191, 282 A. 2d 154, 160 (1971). In my view, his credibility based upon the information about him contained in the affidavits, is not an absolute zero — it is a minus. The data concerning the circumstances under which the information was furnished not only fails to establish any informational reliability, but rather leads me to believe that the coatseller had every reason to fabricate his information out of whole cloth.[2] Under these circumstances, extensive

---

**1.** I am fully cognizant of the established proposition that the standard of probable cause is only the probability and not a prima facie showing of criminal activities. Hudson v. State, 16 Md. App. 49, 56-57, 294 A. 2d 109, 113 (1972). I am not suggesting that if the unnamed coatseller were found to be credible, corroboration of his reliable information would be a condition precedent to the establishment of probable cause. I am simply stating the obvious: the fact that one is a thief and an accomplice to a crime detracts from his credibility whether he is giving information as a witness at a trial or as an informant in an affidavit supporting a search warrant.

**2.** I am fully cognizant of the established proposition that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, Husdon v. State, *supra*, and its corollary that information given to the police in a voluntary confession by a co-defendant, naming some other person as a confederate, can afford a basis for probable cause to believe that the person so named was a

independent observations are required to establish his credibility and to permit his information to be utilized in the determination of probable cause.

The modicum of significant detail recounted by the coatseller consists of his statements that:

1) he had been inside Watson's apartment;

2) he had gotten Mrs. Wallace's coat from Watson while at Watson's apartment;

3) while at Watson's apartment he had seen two color television sets, a gray coat and a "diamond watch of the same description as the one stolen from [Wallace]."

The extrinsic evidence relied upon by the majority as verification of these details consists of:

1) affiant Wallace's confirmation of the fact that the red coat in the coatseller's possession, a color television set and a diamond watch of the type described by the coatseller had been stolen from him;

2) the son's having "placed 'Inkydink's' 1967 Thunderbird at the robbery scene";

3) the conclusion that "the son may well have established . . . the voice of the second robber as that of 'Inkydink' ";

---

confederate and a participant in the perpetration of the crime. Thompson v. State, 16 Md. App. 560, 567, 298 A. 2d 458, 462 (1973); Edwards v. State, 7 Md. App. 108, 112 n.1, 253 A. 2d 764, 767 n.1 (1969); Boone v. State, 2 Md. App. 80, 93, 233 A. 2d 476, 483 (1967). However, I see a distinct difference between the reliability of information voluntarily given by a confederate in a confession to the police and the reliability of information given by a confederate to a private party under unknown circumstances. In both instances the confederates are motivated to exculpate themselves by blaming another. But the confessor to the police is further motivated to tell the truth by the certain knowledge, imparted to him by the police, that the veracity of his statements will be subjected to scrutiny by the prosecutor, a jury and/or a judge. Thus in his case there are some circumstances reasonably insuring the reliability of the information and affording it some degree of persuasiveness. In contrast, the informant relating information to a private party is totally without motivation to do anything other than exculpate himself. The absence of any circumstance reasonably insuring the reliability of such information divests it completely of any persuasive character.

4) "independent information" which "establishe[s] that 'Inkydink' was familiar enough with the Wallaces to direct the criminal effort toward specific, more valuable chattels"; and

5) "independent information" which "establishe[s] that 'Inkydink' would have had need to delay his entrance onto the crime stage until the confederate had hooded the victim who might otherwise have recognized him." [3]

Affiant Wallace's affidavit did state that his wife's red coat which the coatseller possessed, a color television set and a diamond watch of the type described by the coatseller had been stolen from him. But the fact that the coatseller was in possession of the stolen goods, which raises the inference that he was the thief, cannot conceivably support or bolster his credibility. In the absence of any detail describing the two color television sets allegedly seen by the coatseller at Watson's apartment, the fact that a television set was stolen from Wallace offers no confirmation of the coatseller's direct observations. As to the watch, the fact that an informant has accurately described stolen goods not in his possession usually would lend credence to the reliability of his information. In the instant case, however, Wallace's information that the watch described by the coatseller was stolen from him cannot be used to support the credibility of the one who, it may be inferred, stole the watch, since if he were the thief, he clearly would be able to describe the stolen goods. That he accurately described the watch, therefore, cannot be used to indicate that his information is reliable.

The remaining items of verification all relate to the identification of Watson as a possible perpetrator of the crime. They do not relate to any of the direct observations of the coatseller. In relying upon them, the majority confuses

---

3. I have explained the areas of my disagreement with the conclusions drawn by the majority from the facts set forth in the affidavits in Section I(A)(1) above. Under my analysis here, the same result would be reached whether the disputed conclusions are included in or excluded from consideration. I therefore assume them to be valid for the purposes of this discussion.

the dual functions often served by an affiant's direct observations. First, such observations serve as factual premises necessary to support the conclusion that probable cause exists. In addition, they may, under proper circumstances, serve the function of corroborating or verifying hearsay information provided by an informant whose credibility has not otherwise been established. *Dawson v. State*, 11 Md. App. 694, 703, 276 A. 2d 680, 684-85 (1971). But not every direct observation of an affiant tending to show probable cause can automatically also be utilized as verification. Only such observations of an affiant as independently establish the existence of some of the significant direct observations recounted by the informant can serve this purpose, for only "if some of the significant details of the informant's story are shown to be, in fact, true" are we encouraged "to believe that all of the story is probably true." *Dawson v. State*, 11 Md. App. 694, 704, 267 A. 2d 680, 685 (1971). Only if the informant is shown to be right about some facts are we entitled to conclude that he is more probably right about other facts — usually the critical and unverified facts. *Spinelli v. United States*, 393 U. S. 410, 426-27, 89 S. Ct. 584, 594 (1969) (White, J. Concurring).

Here none of the remaining direct observations of the affiants independently establish the existence of the few significant facts recounted by the coatseller. None of them show that any of his observations are in fact true. Had the coatseller described Watson's car or given its tag number, the fact that affiants Wallace and Detective Raubaugh had through their personal observations and investigations independently established that Watson owned a car of that description and tag number would have provided verification of the reliability of the coatseller's information. Had the coatseller stated Watson's address and apartment number, the fact that affiant Wallace, as a result of his own personal observations, knew that 5200 Livingston Terrace, Apartment 202, Oxon Hill, Prince George's County, Maryland, was in fact Watson's residence would have verified and lent credence to the reliability of the coatseller's information. Had the coatseller stated that the name Harris

appeared on Watson's apartment door, the fact that affiant Wallace, as a result of his own observations, knew this to be true would serve as verification of a fact recounted by the informant. But the coatseller offered no such descriptions or information. He stated only that he went to Watson's apartment; that he obtained Mrs. Wallace's stolen coat there; and that while there he saw two color television sets and a diamond watch matching the description of the one stolen from Wallace. Neither the son's statement that he saw Watson's 1967 green Thunderbird at the robbery scene, nor the fact that the voice heard by the son might have been that of Watson, nor the fact that the robber was familiar with Wallace and his circumstances, nor the fact that the robber was previously known to the Wallaces and had reason to delay his entrance upon the scene of the crime can establish, independently, that the coatseller went to Watson's apartment, got the wife's coat there and saw there two color television sets and a diamond watch matching the description of the one stolen from Wallace. Given the paucity of the coatseller's direct observations and the absence of any personal observations by the affiants which independently establish the existence of any of the few facts recounted by him, I can only conclude that the extrinsic evidence relied upon by the majority is completely inadequate to overcome the coatseller's negative credibility rating as established in the affidavits. By no stretch of the facts, the inferences or the imagination can I find, as does the majority, that the information provided by the coatseller is "as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration." *Spinelli v. United States, supra,* 393 U. S. at 415, 89 S. Ct. at 588. The coatseller's information, having failed to pass *Aguilarian* muster, cannot be relied upon.

In the absence of the coatseller's information that he saw the stolen goods at Watson's apartment, there is not enough in these affidavits to furnish probable cause to believe that the stolen goods would be found at Watson's alleged residence. In my opinion, the warrant was improperly issued.

210

## B. The Search and Seizure as Incident to a Lawful Arrest

In denying appellants' motions to suppress, Judge Mathias found not only that there was probable cause for the issuance of the warrant, but also that the search and seizure were justified as incident to a lawful arrest. On this appeal, the State contends that even if the warrant were improperly issued, the search and seizure can be justified as being incident to a lawful arrest.

The record shows that the warrant to search for an RCA portable color television and a woman's gray coat in Apartment 202, Livingston Terrace, Oxon Hill, Maryland was issued on 24 February 1971. About 8:40 p.m. on that date, Detective Raubaugh, a number of other police officers and Mr. Wallace arrived at 5200 Livingston Terrace. Detective Raubaugh "strategically" stationed several officers behind the apartment building. He stationed himself at the ground level front door to the apartment building and dispatched two other officers to the door of Apartment 202, located on the second floor. They knocked at the door and received no response. Hearing movement within the apartment, Detective Raubaugh ran to the rear of the building. He heard the noise of a window being opened, looked up, and saw a woman subsequently indentified as appellant Harris, toss a brown paper bag and an aluminum foil package from a second floor window. Detective Edward Wright caught the brown paper bag. The aluminum foil package fell upon the ground. Both detectives observed, felt and smelled the contents of the paper bag and, based on their experience, concluded that it contained marijuana in an amount sufficient for more than one person's use. Detective Raubaugh instructed Detective Wright to maintain a "chain of custody" with respect to the paper bag and the aluminum foil package; instructed the other uniformed officers stationed behind the apartment building to be careful because it was possible that the person they were looking for was armed; and instructed Detective Daniels, who had remained near the front entrance of the

apartment building, to force entry in order to prevent escape or destruction of evidence.

Daniels immediately began to kick at the door to Apartment 202, but to no avail. Within two or three minutes appellant Harris opened the door. She was then standing in the "living room-dining area" of the apartment. She was arrested immediately by Detective Raubaugh and advised of her rights. Various other officers and Wallace arrived on the scene. "A systematic check throughout the entire house for property stolen from Mr. Wallace" was made. The officers seized a television set, some tape decks, some amplifying equipment, some tires mounted on wheels and three mag-chrome wheels in the living room-dining area of the apartment. None of these items belonged to the victim Wallace or the Colony 7 Motor Inn, Inc. A fully-loaded .38 caliber pistol was found in either the living room-dining area or the bedroom of the apartment.[4] Various and sundry other articles were found in the bedroom of the apartment in or on a chest of drawers, a closet and the bed. Among these articles were two watches, a Polaroid camera, some clothing and a blanket, all identified at the time by Wallace as belonging to him. Also among these articles was a GE portable color television, serial number 5HOLO7219, subsequently identified as having been stolen from a motel owned by Colony 7 Motor Inn, Inc., on 5 January 1971. The RCA portable television and woman's gray coat particularized in the warrant were not found.

It is axiomatic in Maryland that police officers may make a warrantless arrest when a misdemeanor is committed in their presence or where they have probable cause to believe that a felony had been or was being committed and that the person to be arrested committed it. *Collins v. State*, 17 Md.

---

**4.** Detective Raubaugh, who did not himself engage in the search but sat at the dining room table as items were brought there for inventorying, testified that the gun was found behind a picture on a television set in the living room-dining area. Officer Daniels, who personally engaged in the search, testified that the .38 caliber pistol, which he had initialed, was found in the bedroom. On cross-examination he stated that Detective Raubaugh would be incorrect if he had testified that the gun was found in the living room-dining area.

App. 376, 383, 302 A. 2d 693, 697 (1973); *Thompson v. State,* 15 Md. App. 335, 341, 290 A. 2d 565, 568 (1972); *Denikos v. State,* 9 Md. App. 603, 608, 266 A. 2d 354, 357 (1970); Code (1957), Art. 27, § 594B. It is equally axiomatic that a search without a warrant is reasonable if it is incidental to a lawful arrest. *Gross v. State,* 235 Md. 429, 440, 201 A. 2d 808, 814 (1964); *Brown v. State,* 15 Md. App. 584, 588, 292 A. 2d 762, 765 (1972); *Richardson v. State,* 14 Md. App. 487, 495, 287 A. 2d 339, 343 (1972).

The controversy which raged in the Supreme Court between 1927 and 1969 "over the permissible scope . . . the range in space — the search perimeter — of an admittedly proper 'search incident,' " *Brown v. State, supra,* 15 Md. App. at 588, 292 A. 2d at 765 was ultimately resolved in *Chimel v. California,* 395 U. S. 752, 763, 768, 89 S. Ct. 2034, 2040, 2043 (1969).

> "There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control' — construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.
>
> "There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs — or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less. (Footnote omitted.)
>
> * * *
>
> "The search here went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him. There was no constitutional justification, in the absence of the search warrant, for extending the

search beyond that area. The scope of the search was, therefore, 'unreasonable' under the Fourth and Fourteenth amendments, and the petitioner's conviction cannot stand." (Footnote omitted.)

Finally, in *Coolidge v. New Hampshire*, 403 U. S. 443, 465-66 n.24, 91 S. Ct. 2022, 2038 n.24 (1971), the Supreme Court, in explicating the "plain view" doctrine, said, with respect to searches incident to valid arrests inside a constitutionally protected area:

> "Where, however, the arresting officer inadvertently comes within plain view of a piece of evidence, not concealed, although outside of the area under the immediate control of the arrestee, the officer may seize it, so long as the plain view was obtained in the course of an appropriately limited search of the arrestee."

Thus, the Supreme Court established that the "seizure perimeter was broader than the search perimeter." *Brown v. State, supra*, 15 Md. App. at 599, 292 A. 2d at 770.

Application of these principles to the facts of this case produces a clear result. The record here shows that several officers were lawfully behind the apartment building when they saw appellant Harris toss a brown paper bag from the second floor window. Based on their experience, two officers concluded that the bag contained marijuana in an amount sufficient for more than one person's use. Possession of marijuana in sufficient quantities to indicate an intent to distribute is a felony. Code (1957), Art. 27, § 286. Thus there can be no question but that the police had probable cause to believe that a felony had been committed by appellant Harris, and they were justified in making a warrantless arrest.[5] The marijuana, having been abandoned by her, was

---

5. Both appellant Watson and appellant Harris were indicted for both possession of marijuana and possession of marijuana in an amount sufficient to show intent to sell. They were convicted of the former. Possession of any quantity of a controlled dangerous substance is a misdemeanor. Code (1957), Art. 27, § 287. The police were justified in making a warrantless arrest for this crime as well, since they had observed appellant Harris committing the misdemeanor in their presence.

admissible in evidence. *Hester v. United States,* 265 U. S. 57, 58, 44 S. Ct. 445, 446 (1924); *Peterson, Deal & Hunt v. State,* 15 Md. App. 478, 485, 292 A. 2d 714, 719, *cert. denied,* 266 Md. 735 (1972); *English v. State,* 8 Md. App. 330, 340, 259 A. 2d 822, 828 (1969); *Scott v. State,* 3 Md. App. 429, 440, 239 A. 2d 771, 777 (1968), *cert. denied,* 255 Md. 744 (1969).

The record further shows that an officer immediately after witnessing the commission of the crime arrested appellant Harris, who was then standing in the living room-dining area of the apartment. There can be no question but that the police had the right to make a reasonable search incident to the lawful arrest. However, the scope of that search is limited to the area within which appellant Harris might have obtained either a weapon or something that could have been used as evidence against her, and the scope of the seizure is limited to objects found either within that area or outside of the area but in plain view. The record shows that none of the items found anywhere in the living room-dining area of the apartment belonged to Mr. and Mrs. Robert Reed Wallace, Jr., or to the Colony 7 Motor Inn, Inc. The items allegedly belonging to these parties were found in a bedroom of the apartment, in or on a chest of drawers, a closet and bed. The search and seizure of these items, being both beyond the permissible area of the search incident to the arrest and not within the ambit of seizure permitted by the plain view doctrine, were unreasonable under the fourth and fourteenth amendments. Unless there was a constitutional justification for extending the search beyond the living room-dining area to the bedroom, the appellants' convictions with respect to robbery and receiving stolen goods cannot stand.

In its brief the State contends that the officers were justified in "continuing their search of the apartment for appellant Watson and in this search other articles found in plain view would be within the scope of the legitimate search." The State thus attempts to legitimize an otherwise unlawful intrusion into the bedroom as being necessitated by exigent circumstances and thereby validate the seizure of items in the bedroom that were in plain view. This argument

was not raised below and is not properly before us. Maryland Rule 1085. In any event, the contention is totally without merit.

An intrusion into a constitutionally protected area without a warrant can be justified when exigent circumstances are present. *Coolidge v. New Hampshire,* 403 U. S. 443, 455, 91 S. Ct. 2022, 2032 (1971); *Terry v. State of Ohio,* 392 U. S. 1, 20, 88 S. Ct. 1868, 1879 (1968); *Warden v. Hayden,* 387 U. S. 294, 298, 87 S. Ct. 1642, 1645-46 (1967); *Brown v. State, supra,* 15 Md. App. at 603, 292 A. 2d at 773; *Fellows v. State,* 13 Md. App. 206, 209, 283 A. 2d 1, 3 (1971), *cert. denied,* 264 Md. 747 (1972). However, the burden of proof is on the State to show that the warrantless entry was necessitated by exigent circumstances. *Coolidge v. New Hampshire, supra; United States v. Jeffers,* 342 U. S. 48, 51, 72 S. Ct. 93, 95 (1951); *McDonald v. United States,* 335 U. S. 451, 456, 69 S. Ct. 191, 193 (1948); *United States v. Goldenstein,* 456 F. 2d 1006, 1009 (8th Cir. 1972). In order to justify a warrantless intrusion into a constitutionally protected area, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences drawn therefrom, reasonably warrant that intrusion. Here there is not an iota of evidence to establish the existence of exigent circumstances. None of the police officers testified that the intrusion into the bedroom was the result of an effort on their part to locate appellant Watson. Rather, there was substantial testimony that the intrusion was a result of "a systematic check throughout the entire house" to locate goods allegedly stolen from Mr. and Mrs. Wallace and the Colony 7 Motor Inn, Inc., and was undertaken pursuant to what the officers believed to be a valid search warrant. Under these circumstances, I cannot find that the warrantless intrusion into the bedroom falls within the ambit of the exigency doctrine.

On my independent constitutional appraisal of the record, I find that the lower court erred in its denials of appellants' motions to suppress and in admitting into evidence the articles seized in violation of the fourth and fourteenth amendments. I am unable to say that this evidence did not

contribute to appellants' convictions and was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U. S. 18, 26, 87 S. Ct. 824, 829 (1967). Consequently, I would reverse appellant Watson's convictions under counts 1 and 2 of indictment 11,170 and count 6 of indictment 11,171 as well as appellant Harris's convictions under counts 1 and 6 of indictment 11,171.

## II

### Possession of Marijuana
### By Appellant Watson

The majority finds the evidence sufficient to support a conclusion that the appellant Watson was in joint exclusive control of the contraband marijuana. I do not agree.

Code (1957), Art. 27, § 287 makes it unlawful for any person to possess any controlled dangerous substance. Code (1957), Art. 27, § 279 (a) C 7 includes marijuana within the definition of a controlled dangerous substance. Code (1957), Art. 27, § 277 (s) defines possession as "the exercise of actual or constructive dominion or control over a thing by one or more persons." This Court has held that the term control used in the statute means "to exercise restraining or direct influence over" the substance. *Graybeal v. State,* 13 Md. App. 557, 563, 284 A. 2d 37, 40 (1971); *Nutt v. State,* 9 Md. App. 501, 507-08, 267 A. 2d 280, 284 (1970). Under § 287 the State must adduce evidence which meets the test of legal sufficiency. *Williams and McClelland v. State,* 5 Md. App. 450, 459, 247 A. 2d 731, 737 (1968). Such evidence must show directly or support a rational inference that the accused did in fact possess the drug in the sense contemplated by the statute, that is, that he exercised constructive dominion or control over it, or, more specifically, that he exercised restraint or direct influence over it.

In *Davis and Green v. State,* 9 Md. App. 48, 52-53, 262 A. 2d 578, 581, 582-83 (1970), this Court, in reviewing the sufficiency of the evidence with respect to a conviction of control of marijuana said:

"It has been held that where one has exclusive

possession of a home or apartment in which prohibited narcotics are found, it may be inferred, even in the absence of other incriminating evidence, that such person knew of the presence of the narcotics and had control of them; but where the accused has not been in such exclusive possession, it may not be inferred that he knew of the presence of the narcotics and had control of them, unless other incriminating circumstances are shown which tend to buttress such an inference. The Supreme Court of California pointed out in *People v. Redrick*, 359 P. 2d 255, that no sharp line can be drawn to distinguish the congeries of facts which will, and those which will not, constitute legally sufficient evidence that a person had control of a narcotic found in a place to which he had access, but not exclusive access, and over which he had some control, but not exclusive control.

\* \* \*

"The only evidence linking appellant Davis with the marihuana sold by Green to Manzari on February 28, 1968 was that he was a co-lessee of the premises, resided there at least two nights weekly, and had an intimate personal relationship with the co-lessee Green. It was not shown that Davis was on the premises at the time of the sale. There was no evidence or inferences drawable therefrom to show where in the apartment Green kept the marihuana which he sold Manzari, nor was there any evidence showing that Davis knew Green had marihuana on the premises at the time or was using the apartment for the purpose of keeping and/or selling that prohibited narcotic drug. The conviction of Davis for exercising restraining or directing influence over the marihuana sold by Green to Manzari would appear to rest entirely on the fact of his co-occupancy of the apartment and his relationship with Green. To convict Davis because, as a joint occupant of the premises from

which the marihuana was sold, he had non-exclusive access thereto is to infer his guilt solely on account of his intimate relationship and association with Green. We think this, without more, too thin a nexus upon which to predicate guilt, and we therefore reverse Davis's conviction of control of narcotics on February 28, 1968."

The record shows that appellant Watson was a joint occupant of the apartment from the window of which the marijuana was thrown. Because the record further shows that he had neither exclusive possession of, exclusive control over or exclusive access to that apartment, this evidence is insufficient, in and of itself, to permit an inference that appellant Watson knew of the presence of the narcotics and had control of them. *Davis and Green, supra; see Barksdale v. State*, 15 Md. App. 469, 475, 291 A. 2d 495, 498 (1972); *Puckett v. State*, 13 Md. App. 584, 587-88, 284 A. 2d 252, 253-54 (1971).

The only other incriminating circumstances shown which might conceivably buttress such an inference consist of Watson's admission that he had been convicted of possession of marijuana in 1968 and the testimony of Robert Reed Wallace, Jr., that appellant Watson and he were associated in the business of selling narcotics prior to November 1970 and that appellant Watson offered to give him narcotics if he would not testify against him at the trial. I think that any or all of these facts, if believed, are too remote in time and too indefinite in character to be sufficient to justify the inference that appellant Watson had knowledge or control of the narcotics found at 5200 Livingston Terrace. So far as I am concerned, there is nothing in this record to show that appellant Watson himself kept, used or sold narcotics on the premises at any time. Nor was it shown that appellant Watson was on the premises at any time that narcotics were visible, in use or being sold. It was not shown that Watson was on the premises at the time the narcotics in question were discovered. There was no direct or indirect evidence to show where in the apartment appellant Harris kept the marijuana which she threw out of the window, or that any

other narcotics or narcotic paraphernalia were present at the premises. Nor was there any evidence showing that appellant Watson knew or had reason to know that appellant Harris had marijuana on the premises at any time or was using the apartment for the purpose of keeping that prohibited drug. The conviction here, like that in *Davis and Green, supra,* appears to rest entirely on the facts of Watson's co-occupancy of the apartment and his relationship with appellant Harris. I think this, without more, too thin a nexus upon which to predicate guilt and would therefore reverse Watson's conviction of possession of narcotics.[6]

---

**6.** My conclusions with respect to appellant Watson make it unnecessary for me to decide the question of the legality of his arrest.