Dear Honorable Julia W. Gouge,
You have requested our opinion on two questions concerning service animals:
1. Must a service animal be specially licensed or identified to accompany its owner in a public place?
2. What is the meaning of the term "professionally trained" as used in a State statute governing the issuance of orange license tags for "dog guides"?
For the reasons set forth below we conclude:
1. A service animal need not be specially licensed or identified to accompany its owner in a place of public accommodation. The federal Americans with Disabilities Act ("ADA") preempts a State law that requires documentation that the dog is a service animal.
2. A dog may qualify as "professionally trained" if it has been trained by a person who is engaged in the profession of training guide dogs for a living, or by a person with a high degree of proficiency or skill in training dogs regardless of how that person happens to earn a living. The ultimate criterion for whether the dog has the requisite training is whether it has obtained the skills necessary to aid its owner to overcome the particular obstacles associated with the owner's disability. In administering that statute, a local licensing agency may rely on representations made by the applicant in the license application, under penalties of perjury, concerning the dog's training and applicable skills.[1]
 I Whether Service Animals Must Display Special Identification
A. Maryland White Cane Law
Under a Maryland statute popularly referred to as the "White Cane Law," an individual who is visually or hearing impaired is entitled to "full and equal accommodations, advantages, facilities, and privileges" in all "places of public accommodations . . . subject only to the conditions and limitations established by law and applicable to all persons." Annotated Code of Maryland, Article 30, § 33(d)(1). If that individual uses a service dog, he or she "has all the rights and privileges conferred by law upon any other person," whether or not the dog is wearing a special tag or other article demonstrating that the dog is in fact a service animal. Article 30, § 33(d)(2).[2] A "mobility impaired" individual has the same rights to use a service dog. Article 30, § 33(j). However, the statute requires that an individual accompanied by a service dog "display identification issued by a service dog trainer organization which trains and certifies service dogs for the disabled." Article 30, § 33(l).
B. Americans with Disabilities Act
In 1990, Congress enacted the ADA, Pub.L. No. 101-336,104 Stat. 327, legislation that has been described as "the Federal Government's most . . . extensive endeavor to address discrimination against persons with disabilities." Olmstead v. Zimring, 527 U.S. 581, 589 n. 1 (1999). Title III of the ADA prohibits private entities from discriminating "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).[3] The Department of Justice ("DOJ") has issued regulations and provided other guidance to implement Title III of the ADA. See 28 C.F.R. § 36.101 et seq.; ADA Title III Technical Assistance Manual.[4] In its regulations, DOJ has specifically addressed the use of service animals. "Service animal" is defined as "any guide dog, signal dog, or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability, including, but not limited to, guiding individuals with impaired vision, alerting individuals with impaired hearing to intruders or sounds, providing minimal protection or rescue work, pulling a wheelchair, or fetching dropped items." 28 C.F.R. § 36.104.
The DOJ regulations address a facility's responsibilities in connection with individuals accompanied by service animals. "Generally, a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability." 28 C.F.R. § 36.302(c)(1).[5] While recognizing that a number of states have programs that certify service animals, the DOJ guidance makes clear that "[a] private entity . . . may not insist on proof of State certification before permitting entry of a service animal to a place of public accommodation." ADA Title III Technical Assistance Manual ¶ III-4.2300.[6]
C. Federal Preemption of State Identification Requirement
When there is a difference between the ADA and state law, the law granting an individual with a disability the greater level of protection prevails. 42 U.S.C. § 12201(b). Because the ADA generally requires a public accommodation to allow an individual with a disability to be accompanied by a service animal, regardless of whether the individual has documentation that the animal is a service animal, a state law requiring that an individual display proof of an animal's training is preempted. See, e.g., Green v. Housing Authority of Clackamas County,994 F. Supp. 1253, 1257 (D.Or. 1998) (Oregon statute requiring that a hearing ear dog be on an orange leash preempted by ADA).[7]
Therefore, despite the provision in the White Cane Law that requires special identification of service dogs, a facility that is a public accommodation under Title III of the ADA may not require proof that a dog has had specialized training as a service animal.[8]
 II Special License Tags for Dog Guides
Although the ADA precludes a public accommodation from requiring identification that a dog is a service animal, an individual with a disability may choose to display such identification to deter questions. Maryland law permits an individual with a disability who relies on a dog to obtain a special orange license tag identifying that dog as a "dog guide" under certain conditions. You have requested our opinion concerning one of those conditions — that the dog be "professionally trained."[9]
A. Statutory Eligibility Requirements for Orange License Tag
Under Maryland law, a dog owner generally must obtain a license for the dog by paying a fee to the local jurisdiction; licensure is evidenced by a collar tag issued by the local licensing agency and worn by the dog. Annotated Code of Maryland, Article 24, § 11-501. If the dog is a service animal, the local jurisdiction is to waive the fee and issue a special orange tag labeled "dog guide," in addition to the regular tag, in prescribed circumstances. Article 24, § 11-502.
To qualify the dog for the special tag and fee waiver, the license application must indicate, and "the clerk [must] be satisfied that the dog . . . is a `dog guide', professionally trained to aid the blind or visually handicapped or deaf or hearing impaired, or mobility impaired . . . and actually in use for such purpose." Article 24, § 11-502(a).[10] In addition, the owner must submit an affidavit stating that the dog "has been professionally trained as a dog guide." Article 24, § 11-502(b). The local licensing agency is to provide affidavit forms for that purpose. Id.[11]
The statute does not provide any guidance on how to determine if a dog has been "professionally trained." Nor does State law have any licensing or certification requirements for dog guide trainers.
B. Legislative History of Training Condition
The Legislature included a training requirement as a condition for a license fee waiver when it first enacted the predecessor of § 11-502 in 1957. At that time, the statute required that a license application for a "seeing-eye dog"[12] disclose that the dog was "trained to aid the blind." See Chapter 611, Laws of Maryland 1957, codified as Article 56, § 200A. While the statute did not specify the source of that training,[13] the nature of the required training seems clear. The training was to impart skills that would enable the dog to assist a person in overcoming the obstacles imposed by blindness.
In 1978, the Legislature extended the statute to encompass dog guides that "aid the deaf or audio handicapped." Chapter 929, Laws of Maryland 1978, codified in Article 56, § 192. That legislation provided for a special orange tag to identify such a dog. Apparently because the use of dogs by the hearing impaired was less recognized, the amendment required specific training and related documentation as a prerequisite to a special license for a dog guide that assisted a hearing impaired person. In particular, such a dog was to have "at least 3 months training in a professional training school for guide dogs." In the absence of a certificate from the school, the statute permitted the owner to submit an affidavit attesting that the dog had received the required training. However, the following year, the Legislature reconsidered the special training condition and eliminated the requirement of a minimum duration of training at a "school" in favor of simply requiring an affidavit from the owner that the dog had been trained to aid the hearing impaired. Chapter 565, Laws of Maryland 1979.[14] Thus, as with dogs that aided the blind, the training requirement was keyed to the nature of the owner's disability; the only difference was that the training of a dog that assisted a hearing impaired person had to be documented by affidavit.
Finally, in 1990, the licensing law was amended to cover dogs that aid "mobility impaired" individuals. Chapter 569, Laws of Maryland 1990. At the same time, the Legislature revised the statute to provide for orange tags and to impose similar requirements as to training and documentation for all service dogs. In particular, the statute now required that a dog be "professionally trained" to aid a person with one of the three types of listed disabilities "as the case may be." In addition, the owner was to submit an affidavit attesting to that training. Id. However, the amendment did not define "professionally trained." Nor does the legislative file suggest that the Legislature had any special meaning in mind for that phrase. The statute has remained essentially unchanged since the 1990 amendment.[15]
C. Analysis
The history of the dog licensing provision demonstrates that the Legislature has declined to specify training standards for guide dogs, other than requiring that the dog be "professionally trained." While the Legislature has in the past briefly required training by a "school," that requirement no longer appears in the statute. Nor, as we understand it, is there a single industry standard for evaluating whether a dog guide is "professionally trained."[16]
The phrase "professionally trained" appears to refer to the skills and competence of the trainer. Pertinent dictionary definitions of a "professional" include "a person who engages in some art, sport, etc . . . for his livelihood" and "a person who does something with great skill." Webster's New World Dictionary (2d ed. 1986) at p. 1134. Thus, in common parlance, a dog is "professionally trained" if it has been trained by a person who is engaged in the profession of training dog guides for a living, or by a person with a high degree of proficiency or skill in training such a dog regardless of how that person happens to earn a living.
In our view, the requirement that a dog be "professionally trained" must also be assessed in light of the purpose of the orange license tag. The special license tag is not an insignia of the dog's level of schooling. Rather, the ultimate purpose of the special tag is to enable members of the public to readily distinguish a dog guide from a pet and to eliminate the questions and explanations that might otherwise be prompted when a person with a disability seeks to enter a place of public accommodation in the company of a dog guide. The training requirement in the statute thus serves to separate a dog that is simply a companion from one that is trained to assist its owner in overcoming obstacles associated with the owner's disability.
It is notable that the statutory training requirement is not simply that the dog be "professionally trained," but rather "professionally trained to aid the blind . . . deaf . . . or mobility impaired, as the case may be." The training condition thus contemplates that the trainer is skilled in teaching a dog how to provide services adapted to the owner's particular disability. In our view, the focus of the inquiry should be primarily on the skills of the dog in relation to the owner's disability rather than simply on the formal credentials of the trainer.
By requiring affidavits on forms made available by local licensing agencies, the Legislature has provided local governments with a mechanism for making the determination whether a particular dog meets the training criterion.[17] The affidavit form may require representations as to the dog's abilities in relation to the owner's disability, the identity and skill of the trainer, and the course of training.[18] The clerk issuing the orange tag may reasonably rely on information provided in that affidavit.
 III Conclusion
Title III of the ADA precludes a public accommodation from requiring proof that a dog is a service animal before allowing the dog to accompany an individual with a disability into the facility. Thus, to the extent Article 30, § 33(l) would require special identification for a service dog to accompany its owner in a place of public accommodation, it conflicts with the ADA, and is preempted by federal law.
The statute governing the issuance of orange license tags does not specially define the phrase "professionally trained"; nor does the legislative history suggest that the phrase carries a special meaning. In our opinion, a dog may qualify as "professionally trained" if it has been trained in special skills adapted to its owner's disability. The training may be conducted by a person who is engaged in the profession of training dog guides for a living, or by a person with a high degree of proficiency or skill in training dogs regardless of how that person happens to earn a living. In administering the statute, a local licensing agency may rely on representations in an applicant's affidavit that describe the dog's skills and the manner in which the dog was trained.
J. Joseph Curran, Jr. Attorney General
William R. Varga Assistant Attorney General
Robert N. McDonald Chief Counsel Opinions Advice
[1] Our opinion is consistent with the advice that you previously received from the County Attorney's office on these two issues. See Memorandum of Assistant County Attorney Kimberly A. Millender dated February 15, 2001.
[2] That statute reads in relevant part:
(1) The blind or the visually handicapped and the deaf or hearing impaired are entitled to full and equal accommodations, advantages, facilities, and privileges of all common carriers, airplanes, motor vehicles, railroad trains, motor buses, streetcars, boats or other public conveyances or modes of transportation, hotels, lodging places, places of public accommodations, amusement, or resort, or other places to which the general public is invited, subject only to the conditions and limitations established by law and applicable to all persons.
(2) A blind or visually handicapped pedestrian using a service dog and not carrying a cane predominantly white or metallic in color (with or without a red tip); or a deaf or hearing impaired pedestrian using a service dog not wearing an orange license tag or orange collar and on a leash; or a blind or visually handicapped pedestrian or a deaf or hearing impaired pedestrian using a service dog in any of the places, accommodations or conveyances listed in paragraph (1) of this subsection; or a service dog trainer accompanied by a dog that is being trained as a service dog displaying the identification required by subsection (l) of this section, has all the rights and privileges conferred by law upon any other person.
Article 30, § 33(d)(1)-(2). The White Cane Law also addresses the rights of individuals with disabilities in connection with public sector employment, employment supported by public funds, and housing. Article 30, § 33(b), (i). Interference with the statutory rights of a visually, hearing, or mobility impaired individual is a criminal violation, carrying a maximum penalty of $500. Article 30, § 33(g)(1).
[3] "Disability" is defined under the ADA to mean:
with respect to an individual —
(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.
42 U.S.C. § 12102(2); see also 28 C.F.R. § 36.104. The ADA also includes a definition of "public accommodation." See42 U.S.C. § 12181(7); 28 C.F.R. § 36.104.
[4] A copy of this document is available through the DOJ web site. See www.usdoj.gov/crt/ada/taman3.html.
[5] There are exceptions to this requirement. For example, a facility is not required to accommodate a service animal if the safe operation of the facility would be jeopardized or a "fundamental alteration" of the facility would result. See ADA Title III Technical Assistance Manual ¶ III-2300. See also 1 Americans with Disabilities: Practices and Compliance Manual 4:83 (1998). Furthermore, the service animal remains the responsibility of its owner. 28 C.F.R. § 36.302(c)(2).
[6] The Disability Rights Task Force, formed by the Civil Rights Division of DOJ and the National Association of Attorneys General, also addressed this issue in an information sheet titled Commonly Asked Questions about Service Animals in Places of Business (July 26, 1996) ("If you are not certain that an animal is a service animal, you may ask the person who has the animal if it is a service animal required because of a disability. . . . [However,] documentation generally may not be required as a condition for providing service to an individual accompanied by a service animal."). See www.usdoj.gov:80/crt/ada/animal.htm.
[7] To the extent that the ADA does not address a particular matter, the State law applies. For example, Maryland's White Cane Law sets forth certain rights and obligations of individuals who train service animals, a topic not addressed in the ADA. See Article 30, § 33(k).
[8] To avoid confusion, the General Assembly could appropriately amend Article 30, § 33(l) to limit the identification requirement to service dog trainers.
[9] We need not determine, for purposes of this opinion, the extent to which the phrase "professionally trained" in the State licensing statute may differ from the term "individually trained" in the definition of "service animal" in the federal regulations under Title III of the ADA. Even if a state statute sets a higher threshold for licensing of guide dogs, Title III of the ADA, as well as other laws, may require accommodation of a disabled individual with a dog that does not meet the State standard. See Bronk v. Ineichen, 54 F.3d 425, 431 (7th Cir. 1995) (although Wisconsin statute required that "hearing dog" be "specially trained" at "recognized school," housing agency may be required under federal Fair Housing Act to accommodate service animal that lacked such credentials); Green v. Housing Authority of Clackamas County, 994 F. Supp. 1253 (D.Or. 1998) (Title II of ADA, the Fair Housing Act, and the federal Rehabilitation Act all required housing authority to modify policy that prohibited a service dog in an apartment absent verification that the dog was "certified" as a trained service animal).
We also do not assess whether limiting orange tags to "professionally trained" service dogs would raise issues under Title II of the ADA and its related regulations, which prohibit discrimination by public entities on the basis of disability.42 U.S.C. § 12132. See Crowder v. Kitagawa, 81 F.3d 1480 (9th Cir. 1996) (holding that, without reasonable modifications, Hawaii's 120-day quarantine requirement for dogs entering the state discriminated, in violation of Title II of ADA, against the visually impaired who rely on guide dogs).
[10] The subsection reads:
If the application shall disclose and the clerk be satisfied that the dog for which the license is sought is a "dog guide," professionally trained to aid the blind or visually handicapped or deaf or hearing impaired, or mobility impaired, as the case may be, and actually in use for such purpose, the license therefor shall be issued without the payment of any fee and the clerk shall inscribe across the face of the license in red ink the words "dog guide."
Article 24, § 11-502(a).
[11] That subsection reads:
(1) The application shall be accompanied by an affidavit from the owner or owners stating that the dog for which the license is sought has been professionally trained as a dog guide and stating that the owner or owners are aware that the owner may be liable, under Article 30, § 33 of the Code, for damages caused by the guide dog to premises or facilities. Forms for affidavits required under this subsection shall be made available by the local licensing agency in each subdivision.
(2) The dog guide shall be issued an orange license tag in addition to the tag issued pursuant to § 11-501 of this subtitle. The orange tag shall be labeled "dog guide" and shall indicate that it is issued by this State. Pursuant to Article 41, § 18-201
of the Code, the Department of General Services shall purchase the orange tags and make them available to the counties upon reimbursement for the cost of the tags.
Article 24, § 11-502(b).
[12] Because the term "seeing-eye dog" was a trade name, the Legislature later substituted the term "dog guide." Chapter 115, Laws of Maryland 1963.
[13] During the 1960s, the Legislature enacted a precursor of the White Cane Law which conferred a right on a blind person to be accompanied by a dog guide in a place of public accommodation. As originally enacted, that statute required that the dog "be properly identified as being from a recognized school for the certification of dog guides." See Chapter 190, Laws of Maryland 1966, codified in Article 30, § 33. However, the reference to training at a "recognized school" was eliminated the following year, and the amended statute merely required that the dog be "especially trained." Chapter 663, Laws of Maryland 1967.
[14] The 1979 legislation also required that the orange license tags be labeled "hearing ear dog" and that the Department of General Services make such tags available to local licensing authorities at cost.
[15] In 1992, former Article 56, § 192, was transferred to its current codification, Article 24, § 11-502. However, no substantive changes were made. Chapter 4, § 4, Laws of Maryland 1992.
In 1997, the provision of the White Cane Law requiring that a guide dog display special identification was amended to require that the identification be "issued by a service dog trainer organization which trains and certifies service dogs for the disabled." Chapter 556, Laws of Maryland 1997, codified in Article 30, § 33(l). However, no similar amendment was made to the licensing law. Moreover, that provision, at least as it pertains to individuals with disabilities, has been preempted by the ADA. See Part I of this opinion. (The provision presumably still applies to service dog trainers accompanied by a service dog.)
[16] We understand that various organizations have adopted their own standards. For example, Assistance Dogs International, a nonprofit organization of persons engaged in training service dogs, has established minimum standards that its members agree to employ in training guide dogs. See www.assistance-dogs-intl.org.
[17] Article 24, § 1-105 addresses the manner in which a document under oath may be made for purposes of that article. The oath itself serves as a "guarantee of credibility." Watson v. State,18 Md. App. 184, 189, 306 A.2d 599 (1973), cert. denied,269 Md. 759, 768 (1973). An affidavit made in accordance with the statute subjects the affiant to the penalties of perjury. An individual who willfully submits a false affidavit can be prosecuted under Article 27, § 435. Article 24, § 11-509(a) also provides a criminal penalty for violations under the subtitle entitled "Regulation of Animals."
[18] It is our understanding that practices around the State vary. Although the Legislature has not dictated a specific form of affidavit, local licensing agencies may find it useful to agree upon a uniform affidavit form.
 *Page 132